Patrick **CUNNINGHAM,** Plaintiff,

v.

**THE PAUL REVERE LIFE INSURANCE COMPANY,** Defendant.

No. 1:01–CV–822.

United States District Court, W.D. Michigan, Southern Division.

Nov. 22, 2002.

**748**

Mark S. Allard, Varnum, Riddering, Schmidt & Howlett LLP, Grand Rapids, MI, for plaintiff.

K. Scott Hamilton, Rock A. Wood, Dickinson Wright PLLC, Detroit, MI, for defendant.

## OPINION

ROBERT HOLMES BELL, Chief Judge.

This action for disability income insurance benefits and waiver of life insurance premiums under an employer-sponsored benefit plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

## I.

Plaintiff Patrick Cunningham was born on March 24, 1943. In 1998 Plaintiff was employed by S2 Yachts, Incorporated, as Vice–President of Sales and Marketing. S2 Yachts had purchased, on behalf of its employees, a group disability policy, No. 91756, and a group life insurance policy, No. 91757, (PRLMS00024), from Defendant Paul Revere Life Insurance Company ("Paul Revere").[1] The group policies at issue are administered by Paul Revere.

Plaintiff suffered his first heart attack, an inferior wall myocardial infarction, in September 1987. (PRLCL00379).[2] He had a second heart attack in June, 1998, a myocardial infarction involving the anterior wall, as a result of which he underwent left anterior descending vessel angioplasty and stenting. *Id.* After his 1998 heart attack Plaintiff came under the care of Dr. David J. Young, an internist, and Dr. William F. LaPenna, a cardiologist. In July 1998 Plaintiff was diagnosed with significant ischemic cardiomyopathy. (PRLCL00077).

Plaintiff returned to work part-time in August 1998. He attempted to return to work full-time in October 1998, but was unable to perform his duties. (Affidavit of David A. Slikkers, Pl. Exh. A). Plaintiff was referred to a vascular specialist who reported on December 2, 1998, that Plaintiff had peripheral vascular disease and that his 10 year old bypass to the left lower extremity was no longer functioning. (PRLCL00032). In January 1999, Dr. LaPenna advised Plaintiff's employer that because of Plaintiff's ischemic cardiomyopathy he was recommending that Plaintiff be restricted to four working hours per day. (PRLCL00085). In February 1999, Plaintiff was referred to Dr. Lori Holstege, M.D., a psychiatrist, who prescribed medication for his depression. (PRLCL00040). In January 1999 Plaintiff began working half-days with no business trips. (PRLCL00008).

One of the measurements used in assessing cardiomyopathy is the ejection fraction which measures the percentage of the blood emptied from the ventricle during systole. The normal ejection fraction

---

1. After the initiation of this action, Paul Revere was purchased by UNUM Provident Life Insurance Company. For purposes of this opinion this Court will refer to the Defendant as Paul Revere, even though much of the documentation in the Administrative Record refers to UNUM Provident.

2. References in this opinion will be to the bates numbers in the Administrative Record and to the exhibits attached to Plaintiff's brief.

averages 50–75% or 60–70%. (PRLCL00083; Exh. E). In 1987, after his first heart attack, Plaintiff's left ventricular ejection fraction ("LVEF") was 40% (PRLCL00379). In 1998, after his second heart attack, his LVEF was 20%. (PRLCL00008). In July 1998 it was 24%. (PRLCL00077). On October 23, 1998, it was 16%. (PRLCL00082). In January 1999 it was 15% (Simpson's rule) or 26 % (Teicholz Formula). (PRLCL00084; PRLCL00083).

On February 22, 1999, Dr. Young noted that Plaintiff was feeling worse than six months before, and although he had tried working four hours a day, he found that it was overly exhausting. Dr. Young advised that Plaintiff was "clearly incapable of working," but that "[h]opefully, with cessation of work, the patient's overall energy level will improve somewhat so that he will still be functional within the home setting." (PRLCL00070).

On February 23, 1999, Dr. LaPenna confirmed an overall deterioration in Plaintiff's condition and expressed amazement that Plaintiff had been able to continue working as long as he had with "such a severe dilated cardiomyopathy." (PRLCL00087). "Over the past four to five months, he has definitely noticed very poor energy reserve and he cannot work at all. It is now apparent that he is totally disabled and, with his very poor ventricular function, I am sure this will be on a permanent basis." *Id.* "It is now apparent that Pat has permanent, severe left ventricular dysfunction." *Id.* Dr. LaPenna further advised that he would like to have Plaintiff considered for a heart transplant, although he recognized that Plaintiff's peripheral vascular disease was a relative contraindication. (PRLCL00086). Dr. LaPenna wrote Plaintiff's employer to advise that Plaintiff was totally disabled, effective March 1, 1999. (PRLCL00088). "In my opinion, Mr. Cunningham is unable to work for any reason and at any level." *Id.*

Plaintiff applied to Paul Revere for disability income benefits under the group policy. Paul Revere approved Plaintiff's disability claim on May 5, 1999. (PRLCL 00094–92). · The Social Security Administration also determined that Plaintiff became disabled under its rules as of March 1, 1999. (PRLCL00115).

Two years later, on May 1, 2001, Paul Revere denied Plaintiff's claim for continued benefits. (PRLCL 00328–330). Plaintiff appealed the denial. (PRLCL 00482–472). On October 29, 2001, Paul Revere upheld its determination that Plaintiff was not totally disabled within the meaning of the policy. (PRLCL 00519–517). By letter dated April 21, 2001, Paul Revere denied Plaintiff's request for Life Insurance Premium Waiver. Plaintiff filed this lawsuit seeking reversal of Paul Revere's decisions and an award of all benefits to which he is entitled.

## II.

This matter is before the Court on cross-motions for judgment on the Administrative Record. A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan vests discretionary authority in Paul Revere, this Court must apply the arbitrary and capricious standard of review to Paul Revere's decision to terminate benefits. *See Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 555 (6th Cir.1998) (en banc). The court reviews the administrative determination based only upon those documents that were before the administrator at the time

the decision and any appeal was made. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 615 (6th Cir.1998); *Rowan v. Unum Life Ins. Co. of America,* 119 F.3d 433, 437 (6th Cir.1997).[3]

The parties do not agree on the applicable standard of review. Plaintiff contends that although the life insurance policy contains language granting the Claims Administrator discretionary authority, the disability insurance policy does not. The booklet-certificate issued in conjunction with the life insurance policy contains an ERISA attachment which explains that Paul Revere, as the Claims Administrator,

> has full, final, complete, conclusive, and exclusive discretion to determine eligibility for coverage and benefits, under the Group Policy, to determine the amount of any benefits payable under the Group Policy, and to construe and interpret the terms and conditions of the Group Policy and all related documents.
>
> Any decision by the Claims Administrator shall be final and binding on all parties and must be upheld in a court of law unless a participant, beneficiary or other party proves that the decision is arbitrary and capricious and there is no rational basis for the decision.

(Exh. I at ERISA-1).

The disability policy does not contain an ERISA attachment. It does, however, contain the following provision:

> The entire contract is made up of this Policy, the application of the policyholder, applications of the Participating Employers, and application by each Employee. A copy of the policy holder's application is attached to this Policy; each Employee retains a copy of his own application.

(PRLMS 00068). The group insurance application signed by Plaintiff's employer, S2 Yachts, contains the following notice to applicants:

> The coverage applied for provides benefits for the employee welfare benefit plan established and maintained by the employer under the Employee Retirement Income Security Act (ERISA), unless otherwise exempted by law. The employer is the Plan Administrator unless otherwise noted. The Paul Revere Life Insurance Company, as claims administrator, has the *full, final binding and exclusive authority* to determine eligibility for benefits and to interpret the policy under the plan as may be necessary in order to make claims determinations. The decision of claims administrator shall not be overturned unless arbitrary and capricious or unless there is no rational basis for a decision.

(PRLMS00055 & PRLCL00530) (emphasis in original).

■ Notwithstanding this clear grant of discretionary authority, Plaintiff contends that this Court should nevertheless engage in a *de novo* review of the administrator's action because Plaintiff was not aware of the arbitrary and capricious language in the employer's application. Plaintiff notes that although he attached a copy of the disability policy he received to his administrative appeal and to his complaint, and although the employer's application was not attached to it, Defendant admitted in its answer to the complaint that it was a true and complete copy of the policy.

Plaintiff contends that an employer's application, which is not provided to employees, cannot be the basis for an arbitrary

---

**3.** Plaintiff filed a motion to strike materials from the Administrative Record and to supplement the Administrative Record. Defendant did not file a response to the motion, but has advised that for purposes of this motion it will assume that the material submitted by Plaintiff is to be considered part of the Administrative Record. (Defendant's Brief at 9 n. 2).

and capricious standard of review. The Court declines to adopt such a broad rule. Unlike *Edwards v. State Farm Mutual Auto. Ins. Co.,* 851 F.2d 134, 136–37 (6th Cir.1988), cited by Plaintiff, the information provided to Plaintiff was not misleading, it did not cause detrimental reliance, and Plaintiff was on notice that the contract included the employer's application. There is no reason to believe that Plaintiff would not have been provided a copy of the employer's application upon request. Under the circumstances of this case, Paul Revere is not precluded from relying on the discretionary authority reserved in the employer's application, even though that application was not provided to the Plaintiff.

Because the Paul Revere group disability and insurance policies expressly grant the administrator discretionary authority to determine eligibility for benefits and to interpret the policy, this Court must apply the highly deferential arbitrary and capricious standard of review to the administrator's decision. *See Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund,* 203 F.3d 926, 933 (6th Cir.2000). This standard is the least demanding form of judicial review of administrative action. *Williams v. International Paper Co.,* 227 F.3d 706, 712 (6th Cir.2000). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Killian v. Healthsource Provident Administrators, Inc.,* 152 F.3d 514, 520 (6th Cir.1998) (quoting *Perry v. United Food & Commercial Workers Dist. Unions, 405 & 442,* 64 F.3d 238, 242 (6th Cir.1995)).

Plaintiff contends that even if discretionary authority was properly granted to Paul Revere, the Court should not simply defer to the decision of the Claims Administrator because Paul Revere, the Claims Adminis-

trator, had a financial stake in the performance of the Plan.

■ Where, as here, the same entity both funds and administers a plan, it has an actual conflict of interest because "it incurs a direct expense as a result of the allowance of benefits and it benefits directly from the denial or discontinuation of benefits." *Killian v. Healthsource Provident Administrators,* 152 F.3d 514, 521 (6th Cir.1998). A conflict of interest does not alter the standard of review, *id.,* but a reviewing court is required to take the conflict into account as a factor in determining whether the decision was motivated by self-interest or was otherwise arbitrary and capricious. *Peruzzi v. Summa Medical Plan,* 137 F.3d 431, 433 (6th Cir.1998).

### III.

Because Plaintiff was classified as an officer of S2 Yachts at the time of his application for long term disability benefits, Paul Revere has acknowledged that he is a Class 1 employee under the disability policy. (PRLCL00459; PRLMS00103). As a Class 1 employee, Plaintiff is entitled to "own occupation" disability benefits:

TOTAL DISABILITY or TOTALLY DISABLED FROM THE EMPLOYEE'S OWN OCCUPATION means that until he reaches the end of his maximum Benefit Period, the Employee:

1. is unable to perform the important duties of his own occupation on a full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy; and

2. does not work at all; and

3. is under Doctor's Care.

(PRLMS00094).

Paul Revere does not contest the second and third requirements. The only issue for this Court's consideration is whether Plaintiff satisfies the first requirement, i.e.,

that he is unable to perform the important duties of his own occupation on a full-time or part-time basis.

■ In the early months of 2001, Paul Revere undertook a review of Plaintiff's disability status.[4] Paul Revere did not conduct an independent medical examination of Plaintiff. Instead, it merely requested a medical records review by a board-certified cardiologist and an occupational analysis by a vocational expert.[5] By letter dated May 1, 2001, approximately two years after Plaintiff was granted disability benefits, Plaintiff was informed that his disability benefits were being terminated. (PRLCL00330). Paul Revere did not challenge Plaintiff's diagnoses of cardiomyopathy, coronary artery disease, or bilateral lower extremity arterial occlusive disease. Instead, the termination letter highlighted references in Plaintiff's medical records to the fact that he was "doing well" with cardiac rehabilitation, that he was able to walk 6 minutes on a Bruce Protocol stress test, that he was doing well on his medical therapy for his cardiomyopathy and that he remained active

with no complications. According to the medical review by Dr. Hashway, Paul Revere's Board Certified Cardiologist, there was no longer any support for restrictions and limitations from a sedentary to light occupation.[6] Paul Revere's vocational consultant determined that Plaintiff's occupation as a vice president of sales and marketing was a sedentary occupation, and that Plaintiff was no longer unable to perform the important duties of his own occupation. (PRLCL00329).[7]

Plaintiff appealed the denial of disability benefits. (PRLCL00506). He submitted results from a May 30, 2001, echocardiogram showing his LVEF at 17%, and nuclear imaging showing his LVEF at 16%. (PRLCL00485). He also submitted new explanatory letters from his treating physicians, both of whom agree that Plaintiff is permanently and totally disabled. (PRLCL00393 & PRLCL00387).

Dr. LaPenna summarized Plaintiff's health condition as follows:

> In summary, the patient is a 58–year-old gentleman with advanced and severe

4. When Paul Revere initiated the clinical review of Plaintiff's file the request incorrectly noted that Plaintiff was in his "any" occupation period. (PRLCL00244). In February 28, 2001, the clinical review request again incorrectly noted that the policy is an "any occ" policy. (PRLCL00308). In her file notes of March 20, 2001, Jennifer Croft notes that she reassured S2 Yachts that as an officer of the company Mr. Cunningham would have "own occupation" disability benefits to age 65. (PRLCL00296). The eventual termination of benefits was also conducted under an "own occupation" analysis.(PRLCL00330).

5. The Court understands that the failure to conduct an independent medical review is not in itself a basis for finding that Defendant's conclusions about Plaintiff's medical condition were arbitrary and capricious. See Kocsis v. Standard Ins. Co., 142 F.Supp.2d 241, 254–55 (D.Conn.2001); Hightshue v. AIG Life Ins. Co., 939 F.Supp. 1350, 1363 (S.D.Ind. 1996).

6. Dr. Hashway determined on March 14, 2001, that "[i]n light of his documented clinical stability and his ability to 'remain active,' the claimant can pursue sedentary to occasional light exertional activities." (PRLCL00304–305).

7. On April 30, 2001, Kelly Marsiano, M.Ed., CRC, CVE, a Vocational Rehabilitation consultant for Paul Revere, conducted an "own occupation" occupational analysis of Plaintiff's position as vice president of sales and marketing at S2 Yachts. She concluded that:

> The occupation of Vice President is considered to be performed in the sedentary exertional level in the national economy as per the Dictionary of Occupational Titles definition approved by the Department of Labor. Therefore, the claimant does not appear to be precluded from his occupation as performed in the national economy.
> (PRLCL 00324).

coronary heart disease. The patient has a dilated ischemic cardiomyopathy with a poor ejection fraction. The patient has chronic hypotension. He recently has been having chest pains, which might represent angina pectoris. The patient also has severe peripheral vascular disease with previous lower extremity bypass surgery. The patient has an ongoing problem with bilateral claudication. The patient suffers from chronic stress anxiety. He also has depression, which is requiring medical treatment in the form of drug therapy. (PRLCL00393).

Plaintiff is on numerous medications including Altace, Lipitor, Lasix, Ecotrin, Lanoxin, vitamin E, multiple vitamins, Restoril, Celexa, postassium chloride, vitamin C, CoReg, Vioxx, and Vicodin. (Exh. F). Plaintiff has been prescribed relatively low doses of Altace and Coreg because of complications associated with his chronic hypotension. (PRLCL00392).

According to Dr. LaPenna, "any form of work for this patient, not only would not be tolerated, but also would be detrimental. It would put him at risk for even more rapid progression of his medical problems, which could lead to complications. Indeed, the complications could be very severe." (PRLCL00393). Dr. LaPenna explained that reports that he was "doing well," had to be seen in the context of the problems they would anticipate for a person in Plaintiff's position, which would be "overt and refractory congestive heart failure, malignant ventricular arrhythmias and sudden cardiac death, angina pectoris or unstable angina pectoris, and repeat myocardial infarction." *Id.* In fact, "by comparison to any other person in the work force, Mr. Cunningham is doing very poorly, and is unable to return to any form of gainful employment." *Id.* Dr. LaPenna advised that he would typically refer someone in Plaintiff's situation for a heart transplant, except for the contraindications of his advanced peripheral vascular disease and his depression. (PRLCL00391).

In his appeal Plaintiff also questioned the classification of his job as sedentary. Plaintiff had outlined the requirements of his own occupation on his application for disability benefits. He noted that he worked approximately 60 hours per week directing the entire sales and marketing staff, organizing and overseeing the distribution network, meeting sales and profit objectives, and traveling approximately 80 days per year to visit boat dealers, attend boat shows, and to participate in boat owner functions. (PRLCL00004). He advised that his occupation required him to sit 5 hours, stand 2 ½ hours, walk 2½ hours, and drive 1 hour per day, all in 1/2 hour increments. (PRLCL0003).

David A. Slikkers, President of S2 Yachts, advised in his July 9, 2001, affidavit that the job duties of the Vice president of Sales/Marketing for S2 yachts required the following activities:

a. Full time employment, with work days between 8 to 12 hours per day;

b. Domestic and international travel approximately 35% of the time, with 60% travel time during peak times of the year;

c. Overseeing and management of staff of approximately 15 employees, which includes hiring, firing, budgeting, and all of the duties and responsibilities normally associated with a Vice President position;

d. Development and implementation of marketing and advertising strategies and customer relationships;

e. Some lifting is required to accommodate the ability to travel, meet with clients, meet with customers, and meet with vendors . . . .

(Exh. A at ¶ 4). Mr. Slikkers also noted that the luxury boat market within which S2 Yachts operates is a highly competitive market, and that economic volatility, both domestically and internationally, has a significant impact on Sales/Marketing of luxury boats. (Exh. A at ¶¶ 5–6).

By letter dated October 29, 2001, Paul Revere completed its internal appellate review and made a final denial of Plaintiff's request for disability benefits. "Regrettably, our internal medical consultant continues to opine that Mr. Cunningham retains the ability to perform at his pre-disability level of occupational function." (PRLCL00519).

█ In determining whether Paul Revere abused its discretion in terminating Plaintiff's disability benefits, this Court examines the reasons relied on by Paul Revere.

Paul Revere forwarded the May 30, 2001, LVEF test results to its internal medical consultant, Dr. Hashway. Upon review of the new results, Dr. Hashway stated:

> Two independent measurements of ejection fraction were close: ECHO LVEF=17%; nuclear LVEF=16%. In the absence of functional testing and with surveillance-documented activity, claimant appears capable of sedentary to occasional light exertional occupational activity.

(PRLCL00484).

A September 11, 2001, updated vocational assessment by Paul Revere's disability vocational consultant, Laura M. Sewell, M.Ed., provided the following clarification of sedentary work:

> The prior occupational analysis identifying the insured's occupation as VP of Sales is accurate, but I can clarify one aspect of the vocational review. The exertional level of sedentary means that the occupation is typically performed while seated. This does not mean that

the pace and demands of the occupation are slow or easy. For example, this occupation typically involves extensive traveling—in today's economy more than ever. This can be hectic and fast-paced, but still sedentary. Also, sedentary occupations can involve up to 2 hours a day of standing and walking. This would encompass traveling demands. Sedentary occupations can be demanding and pressured, as this one is due to the level of responsibility, the variety of demands, and the need for extensive travel.

(PRLCL00518; PRLCL0509).

The individual performing the clinical review noted that Ms. Sewell's vocational clarification appeared to support the restrictions and limitations listed by Plaintiff's physicians. The file was accordingly forwarded again to Dr. Hashway asking whether the demanding and pressured nature of the job, plus the fact that Plaintiff has an ejection fraction of 16 to 17% altered the conclusion of his 6/28/01 review. Dr. Hashway responded:

> I had commented on this file on 3/14/01 and 6/28/01. On 4/30/01, Kelly Marsiano characterized the claimant's occupation as sedentary. I had opined on both occasions that the claimant was capable of sedentary occupational activities. This opinion was based on the claimant's clinically stable course and documentation of his activity level in the file and on surveillance tape. These observations are not negated by his ejection fraction (EF) of 16–17%; in fact, they argue against using EF alone as a measure of functional and occupational capacity.
>
> My definition of "sedentary" is based on the DOT statement on exertional standards. Ms. Sewell adds to that definition: "Sedentary occupations can be demanding and pressured . . . ." In response to your question, based on the

DOT definition, Ms. Sewell's letter, even with an EF of 16–17%, does not alter my conclusions as previously stated. The clinical basis, as stated above, are the claimant's history and documented ambulatory capacity.

(PRLCL00513). Based upon Dr. Hashway's findings, Paul Revere advised Plaintiff that despite his "significantly reduced ejection fraction and physician opinion of total disability," Paul Revere was affirming its previous determination that Plaintiff was not entitled to disability insurance. (PRLCL518).

As noted above, this Court reviews the denial of disability benefits under the arbitrary and capricious standard. "A decision is not arbitrary and capricious if it is based on a reasonable interpretation of the plan." *Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund,* 203 F.3d 926, 933–34 (6th Cir.2000).

> When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was "rational in light of the plan's provisions." *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988). Stated differently, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis,* 887 F.2d at 693 [*Davis v. Kentucky Fin. Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir.1989) ].

*Williams v. International Paper Co.* 227 F.3d 706, 712 (6th Cir.2000).

Upon review of the Administrative Record this Court is convinced that Paul Revere's denial of Plaintiff's claim for continued disability benefits was arbitrary and capricious because it is not a reasonable interpretation of the plan and is not based on the evidence. Plaintiff, his treating physicians, his employer, and his vocational expert, Robert B. Ancell, Ph.D.,[8] have all opined that Plaintiff is unable to meet the demands of his occupation. The only evidence Paul Revere relies on to rebut this determination is the characterization of Plaintiff's occupation as sedentary, evidence of Plaintiff's clinically stable course, and documentation of his activity level in the file and on surveillance tape.

The characterization of Plaintiff's occupation as sedentary is not an accurate reflection of Plaintiff's occupation as evidenced in the file. Plaintiff described his occupation as involving 5 hours of sitting as well as 5 hours of standing and walking every day. There is no evidence to the contrary. This is not a sedentary occupation even under Ms. Sewell's definition. The record also reflects that a third of Plaintiff's job involved domestic and international travel, and that some lifting is necessarily required to accommodate the ability to travel and to meet with clients, customers, and vendors.

Dr. Hashway found that Plaintiff was able to perform a sedentary occupation. He made no analysis of whether Plaintiff had the physical capacity to stand and walk 5 hours a day, day after day, or to travel to boat shows and vendors. In fact, the evidence of record repeatedly reflects that Plaintiff is easily fatigued and that it takes him days to recover after he overexerts. For example, Dr. Young's notes from April 25, 2000, reflect that Plaintiff "[h]as his good and bad days and clearly when he even overdoes it such as working

---

**8.** Robert B. Ancell, Ph.D., a Rehabilitation Consultant, stated in his letter of July 2, 2001,
From a vocational rehabilitation standpoint, Mr. Cunningham has sustained very significant vocationally limiting problems.

I certainly totally agree with his treating cardiologist that there are absolutely no jobs that exist in the market place that Mr. Cunningham would be able to perform. (PRLCL00501).

in his garden he can feel fatigue for a few days thereafter." (PRLCL00168). On January 26, 2001, Dr. LaPenna reported that Plaintiff's legs were fatiguing somewhat quicker since he began taking Coreg. (PRLCL00262). On May 31, 2001, Dr. LaPenna reported that Plaintiff is weakened and debilitated by his severe dilated cardiomyopathy which takes away all of his energy reserve, and that he is not capable of traveling. (PRLCL00392).

Dr. Hashway indicates that he based his finding that Plaintiff is not disabled on Plaintiff's clinical stability and documentation of his activity level.

In focusing on Plaintiff's clinical stability, Dr. Hashway completely ignores the fact that Plaintiff only became clinically stable when he was away from the stresses of his occupation. On August 16, 1999, Dr. LaPenna reported that Plaintiff "looks remarkably good" and "continues to feel better," and that "most of this has been an improvement because of his disability status and stopping work." (PRLCL00140). Dr. Young's notes from April 25, 2000, reflect that Plaintiff has been feeling better since being placed on disability and away from work. (PRLCL00168). On May 31, 2001, Dr. LaPenna again noted "that Plaintiff had significant improvement once he stopped working." (PRLCL00393). Dr. Hashway's focus on Plaintiff's clinical stability also ignores Dr. LaPenna's explanation that when he said Plaintiff was "doing well," it was in the context of someone in Plaintiff's serious medical condition.

It is also evident that Dr. Hashway simply ignored the objective evidence of Plaintiff's significantly reduced ejection fraction because it did not fit the conclusion he sought to reach. Dr. Hashway counseled against using the LVEF alone as a measure of functional and occupational capacity, and then ignored the low LVEF numbers based on Plaintiff's activity level as

evidenced in the file and on surveillance tape. The evidence of Plaintiff's activity level on which Dr. Hashway relies is both outdated and severely overstated. The only stress test on file was taken in October 1998. Although Dr. Hashway refers to a surveillance tape as justification for his determination that Plaintiff can engage in his previous occupation, Dr. Hashway does not attempt to explain what information on the surveillance tapes is sufficient to overcome the effects of Plaintiff's low ejection fraction. The investigative report indicates that Plaintiff was under surveillance for 5 days in April 2001. (PRLCL00354). Plaintiff was observed driving his car on several occasions, walking from his car to a business, and walking into his back yard, but most of the time he was in the house where his activities could not be determined. (PRLCL00354–341). This scant evidence provides no reasonable basis for ignoring the objective indicators showing the continual deterioration of the strength of Plaintiff's severely compromised heart function.

Finally, Dr. Hashway gave no consideration to how the demands of Plaintiff's occupation as vice-president of sales and marketing might exacerbate his already precarious coronary condition. Dr. LaPenna clearly stated that Plaintiff would be unable to be under stress of a job such as sales manager, account executive. (PRLCL00392). He noted that any form of work for Plaintiff "not only would not be tolerated, but also would be detrimental. It would put him at risk for even more rapid progression of his medical problems, which could lead to complications. Indeed, the complications could be very severe." (PRLCL00391).

This case is uncannily similar to *Shipp v. Provident Life & Acc. Ins. Co.*, 214 F.Supp.2d 1241 (M.D.Ala.2002), another case where Provident abruptly cut off dis-

ability benefits under an "own occupation" policy to an individual with a serious heart condition and a stressful occupation. The following analysis from *Shipp* could easily be applied to this case:

> Although Dr. Mangel warned that stress and near-constant travel would further endanger Shipp's health, Provident's clinical reviewers only looked at Shipp's ability to work from the perspective of physical requirements—as if Shipp's ability to work could be judged solely with respect to the degree of manual labor he might be required to perform. Can Shipp sit at a desk on a full-time basis? Probably. Dr. Mangel's conclusion that Shipp was disabled, however, took into account the overall effect that Shipp's occupation was likely to have on his already precarious situation.

*Id.* at 1249.

Here, as in *Shipp*, Paul Revere has simply determined that Plaintiff can sit at a desk. Paul Revere has ignored the overall effect Plaintiff's occupation might have on his cardiovascular health. Because the policy requires Defendant to consider Plaintiff's ability to perform his "own occupation," it was an abuse of discretion for Defendant to deny disability benefits without considering the stresses associated with Plaintiff's occupation and its effects on Plaintiff's cardiovascular health.

This Court recognizes that a plan administrator's determination of benefit eligibility is not rendered arbitrary or capricious merely because a treating physician disagrees with other medical diagnoses of the claimant's condition. However, where, as here, Plaintiff's treating physicians have uniformly found total disability, and their finding is supported by objective medical evidence of a severe cardiomyopathy and very low ejection fractions, the plan acted arbitrarily and capriciously and abused its discretion when it relied instead on its reviewing physician's cavalier conclusion

that Plaintiff is not disabled from his occupation based simply on his ability to drive and walk, without regard to the objective medical evidence of his significantly reduced ejection fraction or the likely effects of Plaintiff's own occupation on his cardiac health.

## IV.

■ The Group Life Insurance Policy issued by Paul Revere provides for a waiver of premiums if an individual becomes disabled. (Exh. I at Life–2). For purposes of the life insurance policy, total disability is defined as the inability to perform the important duties of "any job" for which the insured is or becomes qualified by reason of education, training, or experience. (Exh. I at Def.–2).

By letter dated April 21, 2001, Paul Revere denied Plaintiff's request for Life Insurance premium waiver. (Exh. Q). Paul Revere advised that "[s]ince alternative occupations within your restrictions and limitations have been identified in your geographic area, we have no further information to preclude you from performing *'any'* occupation as defined within your Group Life Disability contract." *Id.* (emphasis in original). The denial of life insurance premium waiver was confirmed in Paul Revere's final denial letter of October 29, 2001. (PRLCL00519).

The vocational transferable skill analysis that was done for Paul Revere indicated that Plaintiff had transferable skills to numerous sedentary occupations. (PRLCL00319–20). Dr. Hashway also found that Plaintiff was able to perform the duties of a sedentary occupation, (PRLCL000304; PRLCL00484; PRLCL00513). Although there is substantial evidence in the record that Plaintiff is not capable of any employment whatsoever, applying an arbitrary and capricious standard of review this Court can-

**758**

not say that Defendant's determination that Plaintiff is capable of some sedentary job is an abuse of discretion.

### V.

Where a court has found that the denial of disability benefits was arbitrary and capricious it is appropriate to retroactively grant the benefits without remanding the case where there are no factual determinations to be made. *Williams v. International Paper Co.*, 227 F.3d 706, 715 (6th Cir.2000). A remand might be appropriate in those instances where the plan never had an opportunity to review certain evidence. *See, e.g., University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839, 841 (6th Cir.2000). Here, however, Paul Revere had access to the complete record before denying Plaintiff's application for disability benefits. There are no additional factual determinations to be made, so the retroactive award of disability benefits is appropriate.

Accordingly, for the reasons stated in this opinion, this Court will reverse Defendant's denial of disability benefits, affirm Defendant's denial of life insurance premium waiver, and order Defendant to pay Plaintiff his disability benefits under the plan.

An order consistent with this opinion will be entered.

### *ORDER AND JUDGMENT*

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Defendant Paul Revere's denial of long-term disability benefits to Plaintiff is **REVERSED.**

**IT IS FURTHER ORDERED** that Defendant Paul Revere's denial of a waiver of life insurance benefits is **AFFIRMED.**

**IT IS FURTHER ORDERED** that Defendant Paul Revere shall pay Plaintiff Patrick Cunningham all long-term disabili-

ty benefits to which he is entitled under the group disability plan.