**Roger COUTURE, Plaintiff,**

v.

**UNUM PROVIDENT CORPORATION and Paul Revere Life Insurance Company, Defendants.**

No. 02 CIV. 7392(CM).

United States District Court, S.D. New York.

April 13, 2004.

posed in order to prevent a party's unjust enrichment'').

R. Christopher Owen, Owen & Eddy, White Plains, NY, for Plaintiff.

Robert J. Luddy, Windels, Marx, Lane & Mittendorf, L.L.P., New York, NY, for Defendants.

MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Roger Couture ("Couture") filed this action against UNUM Provident Corporation

("UNUM") and Paul Revere Life Insurance Company ("Paul Revere") seeking disability benefits under a group long-term disability benefit plan ("Plan") established by Couture's former employer, Xylum Corporation ("Xylum").

Before me now are the parties' cross-motions for summary judgment. Couture alleges that defendants have unreasonably denied him long-term disability coverage to which he is entitled under the policy. Defendants contend that they properly denied plaintiff's claim, and that their determination of no benefits should not be overruled. For the following reasons, defendants' motion is granted and plaintiff's denied.

## BACKGROUND

On December 7, 1999, Couture suffered a heart attack while in Denver, Colorado on a business trip. On February 24, 2000, he underwent cardiac by-pass surgery at Westchester County Medical Center. (Pl. Rule 56.1, ¶ 3.) This was his second by-pass. In 1983, he underwent triple bypass surgery. (*Id.*) Moreover, both plaintiff's father and grandfather died of sudden myocardial infarctions at the age of 49. (*Id.*)

Several weeks after his release, Couture suffered complications and returned to the hospital on March 15. Upon examination, he was found to have multiple pulmonary emboli as a result of deep vein thrombosis in the right lower leg. Couture was treated and released from the hospital on March 31, 2000, but further complications ensued. On April 26, 2000, a second chest wound opened and, in addition, a CAT scan showed that there was a non-union at the medical sternotomy site. (*Id.*, ¶ 5.) As discussed more fully, *infra*, the complications continued.

*Initial Benefits Review*

In June 2000, Couture submitted a claim for long-term disability benefits to Paul Revere under the disability policy obtained by Xylum. Plaintiff's claim stated that: he had been unable to work since December 17, 1999; that he did not know when he would be able to return to work; that as a Project Manager his work "involves up to 25% travel to 75% travel each month." (UPCL00006.) Plaintiff also sent an attending physician's statement, prepared by Dr. Daniel Berman, plaintiff's primary care physician, which was only partially complete. In response to the form's questions, Dr. Berman indicated he had last examined plaintiff on May 22, 2000; that plaintiff's subjective symptoms included weakness and leg pain; and that his objective symptom was pulmonary embolism. (UPCL00003.) The employer's statement—completed by Alicia Parrish, Xylum's human resources manager—indicated that plaintiff was the "Director of Program Management" and described his duties as "Proj. Mgt. Coordinate all engineering efforts with out-side vendors. Monitor changes to instruments, control costs, delivery dates. Involves travel to out of state vendors." (UPCL00007.)

On July 27, 2000, Paul Revere approved the claim through September 14, 2000, in part based on conversations with both plaintiff and Dr. Berman that plaintiff expected to be released to return to work as of September. (UPCL 00018, UPCL00016.) The letter also informed Plaintiff that "should [he] experience complications that would extend [his] recovery period," he should contact Betty Watkins, the Paul Revere Customer Care Specialist. Plaintiff did so.

In his physician's statement dated September 6, 2000, Dr. Berman reported that plaintiff was suffering extreme fatigue and indicated restrictions on work and travel

were necessary. In the prognosis for recovery section Dr. Berman simply wrote "uncertain," indicating that plaintiff had not achieved maximum medical improvement and "fundamental changes in the patient's medical condition" would not be expected for six months or more. (UPCL00139.) Plaintiff also sent an updated medical history statement in which he reported that the second chest wound was still open and he continued to experience slight twinges on the left side of his chest. Plaintiff reported that he becomes "extremely fatigued after 2–4 hours of activity such as driving, sitting in restaurants or shopping trips" and "heart palpitations, weakness and breathing distress develops." He indicated that he felt "somewhat better after 2–3 hours napping, but full recovery only comes after a full nights sleep." (UPCL00138–137.)

On October 2, 2000, pursuant to Watkins's request, Xylum provided defendants with a completed Job Analysis form, which indicated that plaintiff worked nine hours per day and spent approximately two hours standing, one hour walking each day, and occasionally he had to lift about ten pounds. (UPCL00147.) In the comment section, Parrish noted that plaintiff's duties required him to travel from 25% to 75% per month lifting luggage, portable computer equipment and supplies. (*Id.*) Several weeks later, Dr. Preston, plaintiff's cardiologist, returned a completed Cardiovascular Medical Assessment Form ("CMAF") along with the results from an Angiography and an EKG to defendants. On the form, Dr. Preston classified plaintiff as a Class I patient under the New York Heart Association functional classification system. (UPCL00157.) He indicated that plaintiff did not suffer Congestive Heart Failure, arrhythmia, angina or shortness of breath (*Id.*)

Christopher Naples, RN, reviewed Dr. Preston's CMAF on behalf of Paul Revere and found no support for restrictions and limitations based on plaintiff being listed as a Class I patient with stable blood pressure and lack of arrhythmias, angina or shortness of breath. (UPCL00159.) When defendants' customer care specialist discussed Preston's report with plaintiff, plaintiff said Dr. Berman was more familiar with the case and would send a separate CMAF for review. (Def. Rule 56.1 ¶ 26.) Despite the fact that five days earlier Dr. Berman told the customer care specialist that Dr. Preston would provide the CMAF (*Id.* ¶ 24), Dr. Berman sent a partially completed CMAF to Paul Revere on October 31, the day after White spoke to plaintiff about Dr. Preston's report. (*Id.*, ¶ 26.)

Dr. Berman did not indicate a diagnosis for plaintiff or indicate which New York classification applied. In the Congestive Heart Failure section, Dr. Berman indicated positive for evidence of peripheral edema, but like Dr. Preston, he indicated negative evidence for Vascular Congestion, Hepatomegly and Pulmonary Edema. He also indicated there was no evidence of arrhythmias or angina. He further indicated that plaintiff suffered from shortness of breath, but noted that that occurred "with constant exertion." Berman did not indicate any treatment plan and in the section for restrictions he merely noted that "Mr. Couture has severe exhaustion. His post-surgical course complicated by cardiac arrest at home from pulmonary embolism." (UPCL00161–162.)

After receiving these reports, Watkins requested a medical review of the file—noting that the earlier clinical review showed that no restrictions and limitations were supported. She specifically asked the reviewer to consider, among other issues, what objective medical evidence sup-

ports the diagnosis and whether the objective evidence support any restrictions and limitations. (UPCL00167.) Dr. Jeffrey Johnson, defendants' in-house cardiologist, reviewed the records and entered a report on November 3, 2000. Dr. Johnson noted that given the complications Couture had suffered a "longer than expected recovery is expected (i.e. 6–12 months versus the normal 3–6 months)." He recommended "cardiac rehabilitation with reassessment in 3 months (1 year post-operative). Otherwise, he is likely limited to sedentary activity." (UPCL00164.) He also suggested an exercise Cardiolite Study would be helpful for further review. (*Id.*)

On November 14, 2000, Watkins spoke with Dr. Preston's and Dr. Berman's offices. Dr. Preston's office told her that, insofar as Dr. Preston was concerned, plaintiff was released and not scheduled to return. (UPCL00169). Dr. Berman's office provided additional notes from September 26 and October 12, 2000 and told Watkins that plaintiff had no further appointments. (*Id.*) Watkins also contacted Couture and asked about his cardiac rehabilitation plan and his plans to return to work. Plaintiff told Watkins that Dr. Preston had informed him that walking 1–2 miles per day, which he did, was the same as rehabilitation. (*Id.*) He told Watkins that he gets so fatigued that he can never return to work, and he has to sit for half an hour after his walk. In this call, Plaintiff stated that defendants were taking too long to make a decision, and said he would get a lawyer and wanted an answer today or tomorrow. (*Id.*) He also informed Watkins that Xylum had terminated his employment in October. (*Id.*)

By letter dated November 20, 2000, Watkins informed plaintiff that his claim had been had been approved, but informed him that he would need to periodically send Attending Physician's Statements

and that the company would need the results of additional testing in February 2001. (UPCL00172.) In a December 16, 2000 Physician's Statement, Dr. Berman wrote that patient had "little chance of improvement" and checked the boxes indicating that the patient was totally disabled both from his own job and any other work. (UPCL00175.) In his attached Claimants Statement, Couture indicated that he intended to return to work "on doctor's instructions." (*Id.*)

Watkins thereafter requested all records from Drs. Preston and Berman for another clinical review and also requested an Occupational Analysis report. Betty Morris, a Vocational Rehabilitation Consultant relied on information from the Job Analysis form from Xylum as well as a follow-up telephone conversation with Parrish on January 22, 2001 to conduct the Occupational Analysis report. (Def. Rule 56.1 ¶ 33; UPCL00183.) In a report dated January 30, 20001, Morris found that "as described [plaintiff's job] is performed at the Light exertion level as defined by the Dictionary of Occupational Titles" and concluded that "if Mr. Couture has the capacity to perform work at the sedentary to light exertion levels, he would be able to perform the duties of his occupation as Director of Program Management at Xylum Corporation." (UPCL00200.)

Pat Edwards conducted a clinical review of the file, including the additional documentation sent by Drs. Preston and Berman, and issued his findings in a report dated January 30, 2001. (Def. Rule 56.1, ¶ 36.) Dr. Preston's notes indicated that plaintiff continued to have palpitations with premature artrial contractions (PACs) and rare premature ventricular contractions (PVCs). He further noted that due to the "benign nature of condition (isolated APCs) patient was reassured and told to check for precipitating factors, i.e. coffee,

chocolate, tea, alcohol and try avoiding these." (*Id.*) Although not mentioned by either party, I find it noteworthy that on January 1, 2001, Dr. Berman wrote "has been ok" in his notes, and made no further notes regarding plaintiff's disability. In his report, Edwards noted that the Holter monitor showed PACs and rare PVC, but that no chest pain was noted, and concluded "The insured appears stable from a cardiac standpoint. [Restrictions and limitations] of Total Disability are not supported. The insured should be able to [return to work] in his previous occupation." (UPCL00196.) He further noted that no cardiolite stress testing or functional testing was included in the file. (*Id.*)

Dr. Johnson also conducted another medical review of the file and additional documents sent by plaintiff's doctors. He concluded "given the presented information, there is no objective evidence on record supporting an inability to do sedentary or light work after 2/24/01 as previously stated. Should the claimant and/or his attending physician disagree with my opinion, an exercise Cardiolite study is recommended." (UPCL00198.)

Defendants notified Couture on January 31, 2001 that benefits would not continue past February 24, 2001. Watkins explained "Based on the medical documentation in our file..., there are no objective medical findings in support of restrictions and limitations preventing you from performing the duties of your occupation as required by the Group Plan. Therefore, no further benefits are available at this time." (UPCL00205.) More fully, the letter stated:

A medical review by a Board Certified Cardiologist has found that you appear stable from a cardiac standpoint....The most recent information from your doctors contains no evidence of recurring

ischemia or of heart failure. Restrictions and limitations of Total Disability are not supported. The information contained in your file does not support the inability to perform at the sedentary or light exertional level after 2/24/2001...

(*Id.*) The letter further informed plaintiff of his right to appeal the decision within 90 days. All told, plaintiff received benefits for the period of June 25, 2000 through February 24, 2001.

*The Appeal Process*

By letter dated March 22, 2001, Plaintiff notified defendants that he intended to appeal their denial of disability benefits, and requested an extension to submit additional information to support his claim. (UPCL00213.) On appeal, the file was forwarded to Adrian Wright for handling. Wright forwarded the entirety of plaintiff's file to him on April 11, 2001 and requested that plaintiff provide any additional information by May 10, 2001. (UPCL00221.)

By letter dated May 24, 2001, Wright informed plaintiff that "after careful review of all file documentation" the company had determined that the termination of benefits was appropriate and that the decision was being upheld. (UPCL00230.) Because Couture had indicated he would submit additional information and had claimed not to have received the complete file, she informed plaintiff that he could submit additional information, and noted that such information should include "clinical data such as an exercise Cardiolite study, EKG, physical exam findings or other clinical data that support the presence of a severe impairment that would prevent you from performing the duties of your occupation." (UPCL 00228–29.)

Plaintiff filed a second appeal on June 19, 2001. Plaintiff's four-page letter details what he considered to be inaccuracies

in defendants' January 2001 letter denying continued coverage. (UPCL00262.) He pointed out that he was receiving continued treatment for an open chest wound, that his heart arrhythmias were caused by continuing medical problems, not precipitating factors like coffee, and that the occupational analysis did not properly take into account the stress of his job and travel. (UPCL00261.) Plaintiff wrote:

> The job analysis does not consider the stress level of the job. Saying the job of Director of Program Management involves sitting in an office and attend meetings is a gross simplification and lack of understanding of the actual stress incurred in each and every day of work.... I do not consider, and my employer does not consider, the important duties of my occupation the ability to sit at a desk, to attend meetings and the ability to occasionally lift 10 pounds...The stressing factors of this position included that there was only one product at this start-up company and thus far there were no sales and income...I was hired and was not given any staff. All the work had to be done by myself, alone. (*Id.*)

He argued that the job analysis focused too heavily on the physical aspects of his job without due regard for other factors. (UPCL00260.) He also indicated that he was unable to pursue a cardiac rehabilitation program because Dr. Preston had advised against it after plaintiff had so many complications. (UPCL00262.) In response to UNUM's request for a cardiolite test, he pointed out that in 1998 and 1999 responding to his complaints of extreme fatigue, his cardiologist at the time conducted several stress tests—the last one on November 17, 1999 three weeks before he had a heart attack—and none of them indicated any reason for his discomfort. Plaintiff therefore concluded, "I do not believe that the conclusions from any stress testing would be valid in determining any danger I might be placing myself into by returning to work while I am still experiencing extreme fatigue." (UPCL00260.)

On this appeal, Plaintiff submitted additional information and medical records including a letter from Xylum regarding his responsibilities, an EKG dated March 17, 2000, a Cardiac Functional Capacity Assessment (CFCA) Form from Dr. Preston and an Attending Physician Statement from Dr. Berman. On this CFCA dated June 8, 2001, Dr. Preston diagnosed plaintiff as having "coronary artery disease, s/p CABGx2 (1983, 2000), hypertension and hypocholosterolemia" and listed him as a Class II NYHA patient. (UPCL00241.) In the space provided to identify clinical findings, Dr. Preston wrote "Patient has easy fatigability. Forces himself to walk 2 miles a day, but after 1/2 mile is very tired and after 1 mile has diffuse muscle aches/pains." (*Id.*) The report also described plaintiff's pain and the prescribed medicine.

Dr. Preston indicated that the impairment could be expected to last as long as twelve months. He stated that emotional or psychological factors contributed to the severity of plaintiff's symptoms, and that the symptoms were severe enough that they would interfere with his ability to concentrate during the day "frequently (1/3 to 2/3 of 8 hour day.)" (UPCL00239.) Because of this lack of attention, Dr. Preston did not believe plaintiff was even capable of a low-stress job. However, in the functional limitations section, Dr. Preston indicated plaintiff could sit for 4–6 hours continuously, stand and walk each for 1–2 hours continuously. (*Id.*) In response to questions regarding how many pounds plaintiff could lift and carry in an eight hour day, Dr. Preston indicated plaintiff could lift: 5lbs. "frequently" (i.e. 1/3–2/3 of

8 hour working day); 6 to 10 lbs. and 11 to 20 lbs. "occasionally (less than 1/3 of an 8 hour day)." (UPCL00237.) Dr. Berman's Statement indicated that plaintiff could neither work or travel and that he had "little chance of improvement." (UPCL00244.) Couture also included another letter from Xylum which detailed the work he did and highlighted the fact that he had to spend 3 months on-site at a manufacturer helping on the factory floor. (UPCL00258.)

A clinical review of the additional information on this second appeal was performed and completed by Brenda Nunn, RN on July 5, 2001 (UPCL00265–63) who also forwarded the file to Dr. Tom Hashway, a physician, for review. Nunn concluded that "additional clinical data included in the 3/26/01 Doppler Echo and Clmt's classification as a Class II patient does not appear to support updated [restrictions and limitations]. An American Heart Association Class II cardiac patient would have only mild limitations in functional ability and would not appear to be precluded from performing activities which would be rated as sedentary to light exertional level." With respect to plaintiff's concerns regarding sitting during airplane travel and carrying luggage she noted that "Clmt should be able to move around inside airplane at intervals and obtain assistance with carrying luggage and even utilize carts for traveling in airport terminals." (UPCL00263.) Likewise, Hashway concluded "the additional clinical data do not support revised R & Ls." (UPCL00280) He also noted "no objective data is supplied with the assessment. Many of the comments are based on claimants own description of his limitations without objective quantification of his exercise capacity." (*Id.*)

On August 23, 2001, Wright denied plaintiff's second appeal, in which she not-ed that defendants had "carefully considered the options of your treatment providers, based upon our review of the clinical data in file, we have respectfully reached a medical opinion in contrast to the information provided by your physicians." (UPCL00282.) Wright indicated that this decision was based on UNUM's in-house cardiologist's report that the echo report performed on March 26, 2001 "confirmed adequate left ventricular functioning." (*Id.*) He further noted that Class II cardiac patients—which Couture's treating cardiologist had labeled him—"normally have mild limitations that would not preclude sedentary or light work." (*Id.*) This letter—and the referral notes to Dr. Hashway—also acknowledged plaintiff's complaints that UNUM's assessments had not given due weight to the stress his job placed upon him. In closing, the letter informed plaintiff that all administrative actions provided for by the policy had been exhausted and therefore no additional appellate review would occur.

## DISCUSSION

### A. Standard for Summary Judgment

A motion for summary judgment can be granted when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the non-moving party's burden to "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Information Co.*, 970 F.2d 1110, 1112 (2d Cir.1992). In opposing summary judgment, a party may not rest upon unsupported allegations or denials, or simply claim without support that evidence advanced by the movant in support of the motion is not credible. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);

*Mycak v. Honeywell, Inc.,* 953 F.2d 798, 801–802 (2d Cir.1992).

## B. The Arbitrary and Capricious Standard Applies Based Upon the Plan's Grant of Discretionary Authority to Paul Revere

■ The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Fay v. Oxford Health Plan,* 287 F.3d 96, 103–104 (2d Cir.2002). Where the written plan grants discretion to the administrator to determine eligibility, the ultimate decision of the administrator will be viewed with deference unless it is found to be arbitrary and capricious. *See Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995); *Seff v. National Org. of Indus. Trade Unions Ins. Trust Fund,* 781 F.Supp. 1037, 1040 (S.D.N.Y.1992).

The Plan in this case provides that "The employer is the Plan Administrator, unless otherwise noted. The Paul Revere Life Insurance Company, as claims administrator, has the *full, final, binding and exclusive authority* to determine eligibility for benefits and to interpret the policy under the plan as may be necessary in order to make claims determinations. The deci-

sions of claims administrator shall not be overturned unless arbitrary and capricious or unless there is no rational basis for a decision." (Wright Aff. Ex. B, UPMS00038)(emphasis in original). Thus, the arbitrary and capricious standard applies and I will conduct my review of the administrative record with due deference to the claims administrator's determinations as required by law.[1]

Plaintiff contends that the arbitrary and capricious standard should not be applied in this case because defendants have a conflict of interest. Plaintiff's counsel cites no cases from this circuit in support of plaintiff's argument, and instead relies upon cases from the Eighth, Ninth and Eleventh Circuits in which those courts of appeals applied a burden shifting method if there is evidence of a conflict of interest or a sliding scale approach where the arbitrary and capricious standard was reduced in proportion to the seriousness of the conflict. (Pl.Mem., pp. 2–4)(citing *Lang v. Long–Term Disability Plan,* 125 F.3d 794 (9th Cir.1997); *Armstrong v. Aetna Life Insurance Company,* 128 F.3d 1263 (8th Cir.1997); *Brown v. Blue Cross and Blue Shield of Alabama,* 898 F.2d 1556 (11th Cir.1990)).

■ Unfortunately for plaintiff, this circuit has explicitly declined to adopt the reasoning in *Brown* (*see Pagan v. NYNEX Pension Plan,* 52 F.3d at 442), and instead applies a different test. In *Sullivan v.*

---

**1.** For this reason, I cannot consider plaintiff's submission regarding the Social Security determination that plaintiff was disabled from "any substantial gainful activity." (Pl. Rule 56.1 ¶ 21.) Plaintiff submitted the SSA determination to UNUM on July 15, 2002, almost a year after the appeals had concluded and it is therefore not a part of the administrative record. Moreover, even if I could consider the evidence, it is not determinative because SSA decisions are not binding on ERISA plans.

*See Pagan v. Nynex,* 846 F.Supp. 19, 20 *aff'd,* 52 F.3d 438 (2d Cir.1995). The SSA is bound by its own rules to give substantial weight to the opinion of treating physicians, but the administrator of a private Plan is not so bound, and is permitted to give such weight as it deems appropriate to the opinion of a treating physician, as long as that opinion is considered. *Bergquist v. Aetna U.S. Healthcare,* 289 F.Supp.2d 400, 413 (S.D.N.Y.2003).

*LTV Aerospace & Defense Co.*, the court articulated a two-part test to determine whether the administrator's interpretation of the plan is arbitrary and capricious: "First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict." 82 F.3d 1251, 1255–56 (2d Cir.1996). If the court finds that the administrator was in fact influenced by the conflict, the deference traditionally granted will dissolve and the court will interpret the standard *de novo. Id.* at 1256. Following the traditional civil burden of proof doctrine, "the burden of proving that the conflict of interest affected the administrator's decision rests with the plaintiffs." *Id.* at 1259.

In this case, plaintiff argues that defendants faced a conflict of interest because they both administer the plan and make all benefits decisions—including the payment of benefits. Plaintiff argues that defendants' actions were in fact driven by their concern for the bottom line as evidenced by certain email communications. In an email dated February 22, 2001—the month plaintiff's benefits were terminated, James Kearney emailed Gregory Fenn regarding the Xylum account noting that "Group had an open claim (Mr. Couture's) that closed this month. Since inception (4/97), we have lost money on this group (paid claims = $44,757, paid premium = 28,416–PLR = 158%)." (Pl. Mem. At 5, UP0000023.) Plaintiff does not however identify who these individuals are nor does he quote the entire email.

According to defendants, Kearney and Fenn were not involved in the processing of Mr. Couture's claim and this email was written in the context of deciding whether to renew the group policy or not—a decision which necessarily will consider the policy's loss history. (Def.Rpl.Mem., 6). A reading of the entire email supports this. Mr. Kearney, a Provident employee, was responding to a request from Mr. Fenn, a UNUM employee, who had emailed regarding the Xylum account (not Couture's specific claim) and asked Kearney to "run" two different rate scenarios. Kenary's response is not simply about the losses on this policy, but goes on to note the effect of changing the rate structure and Kenary's belief that a sixty-day elimination period could not be accommodated on a 23 life group. (UP0000023.)

Plaintiff also points to two seemingly ominous emails that also do not have anything to do with the processing of plaintiff's claim. On January 19, 2002, Hector Aponte emailed Linda Lunt "you had 'removed from program' the above mentioned 4/1/02 N.Y. case back on 12/19/01. There is nothing in the file, but in the Renewal System, I noticed a comment made stating there are only 2 lives and that it was referred for term. PRISM doesn't show anything to the effect that is due to terminate. Do you recall if the request was sent?" (UP0000020.) In response, Ms. Lunt wrote "Yes, it was sent to Cheryl Mayhan on 12/20. This is one of the cases in the special termination project that I am involved in. Cheryl and Colleen O'Brien are working through the details of terminating these cases so you will not see immediate handling by customer loyalty." (*Id.*)

Although plaintiff does not explain what these emails mean, he argues that they somehow evidence UNUM's concern for "the bottom line." (Pl.Mem., 6.) Defendants explain that these emails were exchanged between individuals who were not connected with the processing of plaintiff's claim, and were sent while UNUM was considering dropping Xylum's policy due to a "dramatic drop in enrollment."

(UPMS00089.) The plan requires 10 lives to keep the policy active, and there were only nine lives insured as of December 20, 2001. (*Id.*) Moreover, the emails were exchanged a full year after defendants decided to terminate plaintiff's benefits.

■ I conclude that these emails do not raise an inference that defendant was in fact affected by a conflict of interest when the decisions were made regarding Couture's claims.

■ Plaintiff also argues that defendants' reviewing physicians were affected by a conflict of interest because they were employees of UNUM. He cites to *Regula v. Delta Family–Care Disability Survivorship Plan*, 266 F.3d 1130 (9th Cir.2001). However, the fact that the reviewing physicians were employed by UNUM is not sufficient in and of itself to suggest a conflict of interest. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (noting that "a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled," but that does not require deference to the treating physician") *abrogating Regula*, 266 F.3d 1130. Nor is their failure to conduct an independent medical exam evidence of a conflict. *Wagner v. First Unum Life Ins. Co.*, No. 02 Civ. 9135 (RLC), 2003 WL 21960997, at *5 (S.D.N.Y. Aug.13, 2003)(failure to conduct independent medical examination not arbitrary and capricious where doctors reviewed medical records in claimant's file). In this case, there was sufficient evidence in plaintiff's medical records to conclude that plaintiff was capable of performing the duties of his own occupation (*see infra*), to rebut any inference that the reviewing physicians were affected by a conflict of interest.

Finally, plaintiff highlights recent litigation and a "60 Minutes" story in which UNUM employees reported that UNUM had set targets for denying and terminating claims. (Pl.Mem., 6.) For example, in *McSharry v. Unumprovident Corp.*, 237 F.Supp.2d 875 (E.D.Tenn.2002), plaintiff McSharry, one of several medical advisors employed by the defendant as a medical consultant, brought suit alleging UNUM had wrongfully terminated him in violation of Tennessee "whistle blower" laws and in breach of their fiduciary duties under ERISA. McSharry alleged that UNUM's standard practice and policy was to deny disability claims, and that medical advisors were improperly used to provide medical language and conclusions in support of the denial. (*Id.*, 877).

I am well aware of UNUM's litigation history, which has caused me to look particularly closely at the record in this case. But my review of the case cannot be based on allegations of past abuses made in lawsuits that are not before me. I must look to the record, and after extensive and searching review, I conclude that there is insufficient evidence that either the doctors or UNUM itself was acting under a conflict of interest to warrant departing from the arbitrary and capricious standard.

## C. Defendants' Determination was Not Arbitrary or Capricious

■ "Under the arbitrary and capricious standard, the scope of judicial review is narrow." *Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir.2003); *Peterson v. Cont'l Cas. Co.*, 282 F.3d 112, 117 (2d Cir.2002). The decision of a claim administrator will not be overturned unless it is found to be (1) without reason; (2) unsupported by substantial evidence; or (3) erroneous as a matter of law. *See O'Shea v. First Man-*

hattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir.1995) (citations omitted); Pagan, 52 F.3d at 442. "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'" Celardo, 318 F.3d at 146 (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)).

To receive total disability under the Policy, the claimant must be "unable to perform the important duties of his own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy." (UPMS00072.) Plaintiff contends that he is unable to perform his job and that UNUM's denial of benefits was arbitrary and capricious for two reasons. He first asserts that his treating physicians' opinions are entitled to more weight than that accorded defendants' reviewing physicians' under the "treating physician" rule, and argues that defendants "denial" of his doctors' opinions constituted an abuse of discretion. (Pl.Mem.7–9). Second, plaintiff argues that "defendants' mischaracterization of [his] job duties requires a reversal of the defendants' denial." I do not agree with either argument.

### 1) The Treating Physician Rule does not apply in this case.

In Black & Decker, the Supreme Court ruled that ERISA claims administrators are not required to accord treating physicians special deference in ERISA actions for denial of benefits. Nor may courts "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan, 123 S.Ct. at 1972. This decision abrogated Regula v.

Delta Family–Care Disability Survivorship Plan, 266 F.3d 1130 (9th Cir.2001), on which plaintiff relied to support his argument that the treating physician rule should apply. Thus, the treating physician rule is inapplicable in this case, and defendants were not required to place greater weight on plaintiff's doctors' determinations than those of the defendants' own reviewers.

Although Black & Decker was decided after the briefs were submitted in this case, the Second Circuit had already declined to adopt the treating physician rule in ERISA cases in which the court actually conducted a de novo review of the administrative record. See Connors v. Connecticut General Life Insurance, 272 F.3d 127, 135 n. 4 (2d Cir.2001). It is therefore reasonable to assume they would have extended this reasoning to the more deferential arbitrary and capricious standard.

The fact that the treating physician rule is inapplicable does not in any way suggest that plaintiff's doctors' opinions are irrelevant. They are an important part of the administrative record and plaintiff's medical file on which claims administrators may base their review. Thus, plaintiff argues that it was an abuse of discretion for defendants to disregard Doctor Preston's conclusion that plaintiff was incapable of even low-stress jobs and Doctor Berman's conclusion that he should neither work nor travel. Plaintiff asserts that, based on the administrative record, "both treating physicians support the restrictions and limitations that would prevent Mr. Couture from being able to perform any occupation, much less his own." (Pl.Mem., 10.) Plaintiff argues that defendants' decision is particularly arbitrary because they never conducted an independent physical examination of him, and Drs. Johnson and Hashway, who were employed by defendants, conducted the file reviews.

Plaintiff calls my attention to two cases, which he argues are directly on point because 1) they involve plaintiffs with severe cardiac disabilities 2) who were denied long term disability by UNUM, 3) based in part on Dr. Hashway's opinion. (Pl. Mem., 15 citing *Cunningham v. The Paul Revere Life Insurance Co.*, 235 F.Supp.2d 746 (W.D.Mi.2002.); *Shipp v. Provident Life & Accident Insurance Co.*, 214 F.Supp.2d 1241 (M.D.Ala.2002)). Couture argues that in both of these cases defendant wrongfully ignored the effects of the plaintiffs' job on his cardiac condition and concluded plaintiffs were capable of working simply because they could sit at a desk. (Pl.Mem., 17.)

In *Cunningham*, the court held that Paul Revere acted arbitrarily and capriciously in denying plaintiff's claim, given the near unanimity the evidence in support of a finding of disability. Both plaintiff's doctors and the objective medical evidence supported plaintiff's position and there was scant evidence on which UNUM based its conclusion. But the evidence in *Cunningham* is quite different from the evidence in this case. In *Cunningham*, the plaintiff had signs of angina, the left ventricle function was severely impaired, and he had undergone and submitted stress tests to Paul Revere in support of his doctors' and vocational expert's conclusion that he was permanently disabled from his occupation. Despite the fact that plaintiff's occupation required him to stand and or walk up to five hours a day, Paul Revere had determined that plaintiff's occupation as Vice President of Sales and Marketing was sedentary in nature, in complete disregard of the extensive travel required. Also, Dr. Hashway's conclusion was based on plaintiff's clinical stability and documentation of his activity level. The court found that Dr. Hashway had determined plaintiff was "clinically stable" primarily based on plaintiff's cardiologist's statements that plaintiff

"continues to feel better" and that Hashway failed to look at the objective medical evidence and ignored the cardiologist's explanation that plaintiff was "doing well" in the context of someone in plaintiff's serious medical condition. *Id.,* 756. Hashway made no findings that plaintiff was capable of walking five hours a day, and apparently discounted the evidence that plaintiff could walk no more than 6 minutes during the stress test conducted by his cardiologist.

The court further concluded that it was "evident" that Hashway had ignored the "objective evidence" regarding plaintiff's reduced ejection from the left ventricle, and instead relied on video surveillance that showed plaintiff could drive to the store to conclude he was capable of performing his important duties. As the court stated, "this scant evidence provides no reasonable basis for ignoring the objective indicators showing the continual deterioration of the strength of Plaintiff's severely compromised heart function." *Id.*

Mr. Couture has not been diagnosed with severe dilated cardiomyopathy or severe left ventrical disfunction, nor has he shown signs of angina. Moreover, as discussed *infra* his own cardiologist determined that he was capable of walking up to two hours a day—an amount consistent with his job duties (*see, infra* 432–34).

*Shipp* is even more readily distinguishable, since the court in *Shipp* considered whether the insurer's decision was "wrong from the perspective of a *de novo* review" (i.e. applied a different standard than I must) and concluded that the plaintiff had adduced sufficient evidence to raise an issue of fact as to the whether Provident's decision to deny him benefits was correct. *Shipp*, 214 F.Supp.2d at 1248. Also, there was more substantial evidence supporting plaintiff's claim of disability than in Couture's as well as indications that Provi-

dent's reviewers may have ignored that evidence. Shipp had been diagnosed with coronary artery disease, and had undergone a stress test that revealed an "anterior wall abnormality." This led the treating physician to note that Shipp had "good functional capacity", but to conclude that there was an "anteroapical defect, raising the question of worsening ischemic disease." *Id.*, 1244. In reviewing the records, Dr. Hashway determined that, in light of plaintiff's performance on the treadmill, he was capable of full-time medium exertional activities. *Id.* And Dr. Johnson concluded that there was no "objective evidence supporting an inability to perform sedentary work as his job description is listed." *Id.*

In denying defendant's motion for summary judgment, Chief Judge Albritton noted two things. First, plaintiff's doctors' conclusions of disability were based on the overall effect of plaintiff's occupation on his condition. The Court believed Provident had ignored the overall effect of Shipp's occupation on his health, which "may have been incorrect." Second the court noted that Provident's vocational analysis had mischaracterized plaintiff's occupation by relying solely on the Dictionary of Operational Titles ("DOT") definition of sales force manager, rather than on the employer's or insured's description of the position. (*Id.*, 1249.)

Despite plaintiff's arguments to the contrary, this is not a case where the administrator refused to credit the views of a claimant's treating physicians or mischaracterized his occupation. Defendants relied on the numerous medical reports that plaintiff's treating physicians had submitted in making their determinations. Plaintiff's treating physicians' opinions were detailed in the final letter denying plaintiff's appeal, and were not ignored. However, plaintiff's treating physicians ultimately failed to support his claim of disability, even though they applied that label to Couture. Dr. Preston classified plaintiff as a Class II cardiac patient, which, according to Nunn, did not support a finding of total disability. A typical Class II cardiac patient would have only mild limitations in functional ability and would not be precluded from performing activities that would be rated as sedentary to light exertional level. The echo report plaintiff submitted also showed adequate left ventricle functioning. (UPCL00282).

■ Defendants did not fully adopt plaintiff's treating physicians' recommendations, in part because they were based on subjective reports from the plaintiff himself and not on objective medical tests. (Def.Mem., 15–18). Subjective complaints of pain can be relevant in making benefits determinations. *See Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127 (2d Cir.2001); *Krizek v. Cigna Group Ins.*, 345 F.3d 91, (2d Cir.2003). But it is not unreasonable—especially in light of available objective medical evidence presented by the echo report and Dr. Preston's clinical classification of plaintiff as a Class II patient—for defendants to seek additional objective data, rather than rely on subjective complaints. And they did. They sent letters telling plaintiff that he could submit additional supporting documents, including objective clinical data, on each of his appeals. But plaintiff never submitted any further clinical information. He merely wrote that, based on his past experience, "[I do] not believe that the conclusions from any stress testing would be valid in determining any danger I might be placing myself into by returning to work while I am still experiencing extreme fatigue." (UPCL00260.) This sounds suspiciously like "I imagine I will do fine on the stress test, but I still don't think I should have to return to work."

It is not unreasonable for an insurer to credit objective evidence over subjective evidence. *See Cook v. New York Times Co. Long–Term Disability Plan,* No. 02 Civ. 9154 (GEL), 2004 WL 203111, (S.D.N.Y. Jan. 30, 2004)(even in cases where diagnosis is difficult and subjective experience of pain and fatigue is the gravamen of the disease, an insistence on objective evidence, standing alone, is not arbitrary and capricious); *Short v. UNUM Life Ins. Co. of America,* No. 302 Civ. 827MRK, 2003 WL 22937720 (D.Conn. Dec.3, 2003).

With respect to plaintiff's concern that no independent medical examination was conducted: while such an examination might have been useful, defendants are not required by law to conduct such examinations. *See Wagner,* 2003 WL 21960997, at *5; *Short,* 2003 WL 22937720, at *9. Plaintiff's focus on the fact that Drs. Johnson and Hashway were employed by UNUM is likewise misplaced. As the Supreme Court noted in *Black & Decker* "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled', so a treating physician, in a close case, may favor a finding of 'disabled.'" *Black & Decker,* 123 S.Ct. at 1971; *see also Wagner,* 2003 WL 21960997, at *5. The key issue is whether defendants had sufficient evidence in the medical record to support its determination without an independent medical examination. It did.

Plaintiff's medical file contains multiple physician statements, employer letters and claimant reports regarding his condition and its progress over several years. Defendants had several physicians and a vocational consultant all conduct complete medical reviews of plaintiff's file before rejecting his claim. Moreover, plaintiff was given several opportunities to submit additional medical information, and was even informed what clinical tests would be useful. He chose not to submit them. Under the arbitrary and capricious standard of review, defendants had sufficient evidence to deny plaintiff continued long term disability payments.

### 2) Defendants' Occupational Analysis Did Not Mischaracterize Plaintiff's Duties

Plaintiff further argues that defendants' "mischaracterization" of plaintiff's job duties is further evidence of an abuse of discretion. Plaintiff asserts that Morris's analysis depended "almost entirely" on the DOT, and thereby failed to acknowledge the importance of travel to his occupation. Plaintiff's claim is however unsupported by the record.

In completing her report, Morris relied upon official employer statements, made a follow-up call to Parrish and reviewed plaintiff's own statements regarding his job responsibilities, in addition to reviewing the definitions provided by the DOT. (UPCL00200). Parrish indicated that plaintiff's job required approximately 2 hours standing, 1 hour of walking and 6 hours of sitting, in addition to the ability to lift approximately 10 lbs. on occasion. When Morris spoke to Parrish, Parrish explained that plaintiff's duties required him to act as a liaison between the in-house staff of Xylum and the vendors who manufactured the equipment. Because the company was in the research and development phase, plaintiff needed to visit the manufacturers to monitor their production procedures to insure that component pieces were manufactured to the specifications required by Xylum. (*Id.*) Morris also wrote that Parrish "confirmed that Mr. Couture was required to travel, often to manufacturing facilities in the mid-west from Scarsdale, N.Y." (*Id.*)

It is clear that Morris was well aware of plaintiff's travel requirements. And Mor-

ris did not classify plaintiff's job as sedentary. She concluded that it fell within the definition of the "light exertional level" as defined by DOT. There was certainly sufficient evidence in the record to support that conclusion, as well as the conclusion that defendant could continue to perform the important duties of his occupation on a full or part time basis and was therefore ineligible for continued benefits.

Neither side saw fit to describe what type of industry plaintiff was employed in, but a thorough review of the record indicates that Xylum was a medical device manufacturer and plaintiff was employed as the Director of Program Management. (UPMS00041, UPCL0007.) Although plaintiff has a highly protective disability policy that protects him from inability to perform his "own occupation" rather than "any occupation," his own occupation is being a "project manager," not a project manager at Xylum. *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252–253 (2d Cir.1999); *Brumer v. National Life of Vermont*, 874 F.Supp. 60 (E.D.N.Y.1995) (citing cases). Even if I concluded that his occupation is a project manager at a start up research and development firm, there is sufficient evidence from which defendants could conclude that plaintiff was capable of performing the important duties of such a position albeit with certain restrictions.

Based on the information submitted by plaintiff and Xylum, and drawing all possible inferences in plaintiff's favor, the important duties of being a project manager include; writing manufacturing procedures, hiring, meeting with manufacturers and in-house research and development people, on-site monitoring of manufacturing processes, and travel to and from manufacturing sites. (UPCL00258). Or, as plaintiff himself writes, "resolv[ing] difficult problems and conflict under stressful

conditions and to be able to engage in extensive travel in solving these problems." (UPCL00271). Evidence suggests that plaintiff would be capable of performing these duties. Dr. Preston himself concluded that plaintiff was capable of walking or standing each for 1–2 hours a day, and could even lift and carry 11–20 lbs. on occasion. (UPCL00237.) To the extent that plaintiff's position as a Project Manager requires site visits, he would presumably need to do some walking, but in his job at Xylum, he was not walking more than 1 hour a day or standing more than 2 hours. (UPCL00147.) Dr. Preston also checked the box indicating plaintiff would need to be absent from work only about twice a month as a result of his impairments, as opposed to three times a month or more. (UPCL00243.)

With respect to the travel requirements, there is no evidence that plaintiff's travel duties require anything more than light exertion. Even in this "post–9/11" world of stressful air travel (which plaintiff emphasizes, *see* Pl. Reply Mem., 4), he can still have carts take him between terminals and to gates, and hire skycaps to carry his bags. And were plaintiff to find himself on a long flight, he could get up and stretch in order to minimize discomfort.

Moreover, there is no evidence in the record that all project management jobs would require as much travel as his position at Xylum, and it is possible that he could find a position involving little or no air travel. Finally, there is no evidence that all jobs of this sort are as stressful as his position at Xylum.

The record contains sufficient evidence tending to show that plaintiff could continue to perform the important functions of his occupation. "Where both the [administrator] and a spurned claimant 'offer rational, though conflicting, interpretations of plan provisions, the [administrator's] in-

terpretation must be allowed to control.'"
*Pulvers v. First UNUM Life Ins. Co.,* 210
F.3d 89, 92–93 (2d Cir.2000).

CONCLUSION

Defendants' motion for summary judgment is granted, and the plaintiff's motion denied. The Clerk of the Court is directed to close the file.

This constitutes the decision and order of the Court.