**Joseph PLITNICK, Jr., Plaintiff,**

**v.**

**Steven FUSSELL, Plan Administrator for Abbott Laboratories Extended Disability Plan, Defendant.**

**No. 3:07CV00228 (DJS).**

United States District Court,
D. Connecticut.

March 10, 2009.

Kevin W. Finch, Law Offices of Kevin W. Finch, Milford, CT, for Plaintiff.

## MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Joseph Plitnick, Jr. ("the Plaintiff") brings this single count action against the defendant, Steven Fussell, Plan Administrator for Abbott Laboratories Extended Disability Plan ("the Defendant"), alleging that the Defendant violated the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1101 *et seq.* ("ERISA"). Specifically, the Plaintiff alleges that the Defendant's decision to deny him long-term disability benefits violated 29 U.S.C. § 1132(a)(1)(B),[1] and he seeks, *inter alia,* an order from this Court directing the Defendant to reinstate the benefits he seeks. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendant has filed a motion for summary judgment. For the reasons that hereafter follow, the Defendant's motion for summary judgment **(dkt. # 20)** is **GRANTED.**

### I. FACTS

The Plaintiff was employed by Knoll Pharmaceuticals Co. ("Knoll"), a division of BASF Aktiengesellschaft ("BASF"), and its successors in interest, from on or about April 1987. On October 9, 1990, he injured his back while working as a sales representative for Knoll. As a result of this back injury, the Plaintiff was out of work and received short-term disability benefits from Knoll periodically between October 1990 and April 1991.

After briefly returning to work at Knoll in April 1991, the Plaintiff re-injured his

1. "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan[]...." 29 U.S.C. § 1132(a)(1)(B).

back and was out of work again in May 1991. On May 28, 1991, the Plaintiff applied for long-term disability benefits from Knoll. He subsequently received such benefits. The Plaintiff also applied for monthly disability benefits from the Social Security Administration ("SSA") and was awarded such benefits, which were retroactive to April 1991.

The Plaintiff's physical condition began to improve within three years. While the Plaintiff continued to receive long-term disability benefits from Knoll, the Plaintiff's orthopedic surgeon at the time, Dr. W. Jay Krompinger ("Dr. Krompinger"), informed Knoll via a letter dated April 5, 1993 that he believed the Plaintiff was "disabled from his prior occupation of a drug salesman," and that the Plaintiff "does have a capacity for light duty, or sedentary work, with a lifting restriction of 5–10 lbs." (Dkt. # 20, Ex. 4.)

On February 13, 1996, the SSA notified the Plaintiff that it had decided to stop providing the Plaintiff with monthly disability benefits. (*See id.*, Ex. 7.) The SSA informed the Plaintiff that "[a]fter reviewing all of the information carefully, [it] decided that [the Plaintiff's] health ha[d] improved since [it] last reviewed [his] case. And now [the Plaintiff is] able to work." (*Id.*) The SSA notice also stated that the Plaintiff had "not cooperated with the Continuing Disability Review Process. Consequently, [the SSA] [was] unable to assess the current severity of [the Plaintiff's] impairment. Since [the Plaintiff] ha[d] not cooperated with the Continuing Disability Review process and it [was] impossible to judge the present level of severity of [his] impairments, [his] disability checks [were being] ceased." (*Id.*)

On May 19, 1998, Dr. Krompinger performed a functional capacity evaluation on the Plaintiff. Thereafter, on September 11, 1998, Dr. Krompinger notified Knoll's disability claims administrator, Unicare, that the Plaintiff was able to work in a sedentary position with certain lifting and bending restrictions. The Plaintiff did not return to work at Knoll. According to the Plaintiff, he did attempt to secure light duty work or sedentary work from Knoll, but such work was not available for him. The Plaintiff thus continued to receive long-term disability benefits.

On March 2, 2001, Abbott Laboratories ("Abbott") announced that it had completed the acquisition of BASF's pharmaceutical business, which included the global operations of Knoll. In connection with this acquisition, Knoll employees' long-term disability benefits were then paid under, and governed by, Abbott's Extended Disability Plan ("the Plan"). Kemper National Services ("Kemper") became the claims administrator for the Plan.

After Abbott notified the Plaintiff in March 2001 that his long-term disability benefits were going to be paid under the Plan, the Plaintiff contacted a representative at Kemper to inquire about vocational rehabilitation. During his discussion with the Kemper representative, the Plaintiff indicated that he was hoping for assistance in starting a home business as a real estate agent, a position he could perform within his medical restrictions and limitations. On March 22, 2001, the Plaintiff sent to Kemper the necessary paperwork to enable Kemper to consider the Plaintiff's request for vocational rehabilitation.

The Plaintiff then met with a nurse sent by Kemper for the purpose of evaluating his request for a vocational rehabilitation program. During this meeting, the Plaintiff represented that he (1) regularly performed the tasks of cooking, child care, mowing the lawn, vacuuming, and climbing stairs; (2) walked two miles daily; (3) was able to drive for twenty miles at a time before needing to stop to stretch and rest; (4) knew how to, and did, use a laptop computer, and knew how to design on the

Internet; (5) was a licensed amateur radio operator; (6) volunteered for the Cub Scouts; (7) served as a recess monitor, whereby he stood and watched children at school for thirty minutes at a time; and (8) owned a few rental properties. After meeting with the Plaintiff, the nurse completed a Field Care Management Assessment form, wherein she concurred with Dr. Krompinger's assessment that the Plaintiff could perform sedentary work.

On October 19, 2001, Kemper issued a Transferable Skills Analysis ("TSA") on the Plaintiff. (*See id.*, Ex. 15.) The TSA provided a description of the Plaintiff's vocational background and an analysis as to whether the Plaintiff would be able, with or without reasonable accommodations, to perform alternate occupations. (*See id.*) The TSA's analysis identified five alternate occupations that the Plaintiff would be able to perform: pharmaceutical detailer; sales representative (dental and medical equipment or supplies); sales representative (hotel and restaurant equipment or supplies); sales agent (insurance); and claims examiner. (*See id.*) In addition, a Labor Market Survey from Kemper, dated October 22, 2001, stated that potential employment opportunities in these five alternate occupations existed near the Plaintiff's home. (*See id.*, Ex. 16.) The Plaintiff, for his part, disputes the TSA's analysis, asserting that the TSA was based on medical documentation that was more than three years old at the time of its completion. The Plaintiff also denies that he could perform the five above-mentioned alternate occupations, and denies that two of those occupations (sales agent (insurance) and claims examiner) comply with the Plan because they did not offer high enough wages.

On April 16, 2002, in response the Plaintiff's expressions of interest in the real estate field, Kemper sent to the Plaintiff a letter containing a vocational plan that had been developed specifically for him to assist him in returning to the workforce as a real estate agent. In the vocational plan, Kemper agreed to continue paying benefits under the Plan to the Plaintiff while he attended the New Haven Real Estate School for three-hour classes twice a week for a six-and-a-half week period. Kemper also agreed to continue paying benefits under the plan while the Plaintiff completed the examination necessary to obtain his real estate license. Kemper advised the Plaintiff that, upon his successful completion of the real estate course and the licensing examination, his Plan benefits would be terminated in accordance with the Plan's terms. The Plaintiff did not agree to this plan, or to two other similar plans that would have sent him to real estate school. The Plaintiff maintains that his medical condition at the time prevented him from being able to participate in these vocational plans.

The Plan required the Plaintiff to submit "due proof" to the plan administrator that he was totally disabled because of sickness or accidental bodily injury. Under the Plan, "totally disabled" means that an employee is "completely prevented from engaging in any occupation or employment for which he is qualified, or may reasonably become qualified, based on his training, education, or experience." (*Id.*, Ex. 10 § 4.1(b).) The Plan also provided that disability benefits would automatically terminate on: (1) the date the employee ceased to be totally disabled; (2) the date the employee failed to furnish due proof of the continuance of total disability upon request by the plan administrator or his agents; or (3) the date on which the employee refused or failed to participate in any rehabilitation program or light duty program when able and requested to do so by his employer. (*Id.* § 4.2.) [2] Under the

---

**2.** In the Plan, there were other circumstances under which benefits would automatically ter-

Plan, the Plan's administrator had the sole discretion to determine the acceptability of all proof of continuing disability.

Despite the fact that the Plaintiff did not participate in the vocational plans, Kemper permitted the Plaintiff to collect disability benefits under the Plan until July 31, 2003. During this period of time, Kemper and counsel for the Plaintiff exchanged a series of letters in which counsel for the Plaintiff asserted that the Plaintiff's Plan benefits should not be terminated. In response, Kemper requested that the Plaintiff either comply with the vocational plans provided to him or, in the alternative, provide medical documentation that would support his claimed inability to complete the vocation plans or otherwise perform sedentary work.

Between April 2002 and July 2003, counsel for the Plaintiff provided Kemper with four medical records in response to Kemper's request for medical documentation. Kemper did not receive any medical records directly from the Plaintiff or his doctors. The medical records submitted to Kemper did not reflect any opinion by any of the Plaintiff's doctors that he was "totally disabled." Kemper had a physician specializing in orthopedic surgery review the Plaintiff's file, including the above-mentioned medical records supplied by counsel for the Plaintiff. The physician concluded that the Plaintiff was not precluded from performing jobs in a sedentary, light duty capacity. The Plaintiff, for his part, denies the physician's conclusions and denies that this physician reviewed the entire medical file.

Based on the physician's findings, Kemper concluded that there was no documentation of an impairment preventing the Plaintiff from performing any job involving sedentary, light duty work. On July 3,

2003, Kemper sent to the Plaintiff a letter notifying him of its finding and informing him that his Plan benefits would terminate effective July 31, 2003 because he had failed to provide due proof that he was totally disabled, and because he refused to participate in the vocational rehabilitation plans presented to him.

On August 27, 2003, the Plaintiff, through counsel, appealed Kemper's decision to terminate his disability benefits. In support of this appeal, the Plaintiff provided Kemper with four additional medical records: (1) an office note, dated October 17, 2002, from Dr. Lane Spero ("Dr. Spero"); (2) an office note, dated November 7, 2002, from Dr. Spero; (3) an office note, dated December 19, 2002, from Dr. Spero; and (4) an office note, dated July 23, 2003, from Dr. Anthony Lendino ("Dr. Lendino"). In none of his office notes did Dr. Spero state or provide any opinion that the Plaintiff was completely prevented from engaging in any occupation or employment for which he is qualified, or may reasonably become qualified, based on his training, education, or experience. In the fourth office note, Dr. Lendino stated that the Plaintiff "remains totally disabled at this time." (*Id.*, Ex. 29.) The Defendant asserts that Dr. Lendino's office note provides no medical evidence whatsoever to support this statement. The Plaintiff denies this assertion, claiming that the document from Dr. Lendino is a signed medical document that sufficiently establishes the Plaintiff's disability.

Kemper then reviewed the Plaintiff's medical file, including these four new documents, and engaged a second peer review physician specializing in orthopedic surgery to assist with this review. This second review agreed with the first review,

minate, but, based upon the parties' submissions, those circumstances are not relevant to this case.

concluding that, as of July 31, 2003, the Plaintiff had not demonstrated a functional impairment precluding him from any occupation, and that the Plaintiff was not totally disabled within the meaning of the Plan. The Plaintiff claims that the review of his medical file was not thorough and contests the findings of this second review. On October 10, 2003, Kemper notified the Plaintiff of the findings of the second review and informed him that it was upholding the original decision to terminate his disability benefits under the Plan.

On November 26, 2003, the Plaintiff, through counsel, filed a Second Level Extended Disability Plan Appeal of the October 10, 2003 decision. In support of this second appeal, the Plaintiff provided one additional medical record, namely, a correspondence from Dr. Spero, dated November 10, 2003. In this new medical record, Dr. Spero represented that the Plaintiff was unable to perform "even the simplest of positions, without any lifting or bending ... because of his inability to be in one position for any period of time greater than 5–10 minutes." (*Id.*, Ex. 33.) The Defendant maintains that this statement was not supported by any evidence of medical examinations or testing, or by any X-ray or MRI results. The Plaintiff claims that Dr. Spero's correspondence is properly supported by medical evidence.

Under the Plan's appeal procedures, the administrator was responsible for issuing a decision on the Plaintiff's second level appeal. Kemper[3] thus sent to the administrator the Plaintiff's file, which now included a report from a third physician specializing in orthopedic surgery and pain management who reviewed the Plaintiff's filed on December 15, 2003. This third physician, after reviewing the Plaintiff's file, concluded that the Plaintiff's physical examination did not indicate a functional

limitation precluding him from sustained light duty work. The Plaintiff contests this finding.

Upon reviewing the appeal summary, which included all the medical documentation provided by counsel for the Plaintiff and the three peer review physician reports, the administrator upheld the denial of the Plaintiff's disability benefits. On January 13, 2004, the administrator sent a letter to the Plaintiff informing him that Abbott was upholding the termination of his disability benefits because the medical documentation provided did not establish that he had a total disability.

## II. DISCUSSION

The Defendant now moves for summary judgment, arguing that the Plaintiff's ERISA claim fails as a matter of law. The Plaintiff argues that there are genuine issues of material fact precluding summary judgment. The Court shall discuss the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

 Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving

**3.** By this time, Kemper had been sold to Platinum Equity, Inc. and renamed Broadspire.

For the sake of simplicity, the Court shall continued to use the old name, "Kemper."

party 'to demonstrate the absence of any material factual issue genuinely in dispute.' " *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)).

■ A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. *DE NOVO* REVIEW OR ARBITRARY AND CAPRICIOUS REVIEW

■ The Court first must resolve the threshold question of what standard of review to apply to the Defendant's decision to terminate the Plaintiff's benefits. It is well settled that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). " 'When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan,' '[t]he court may reverse only if the fiduciary's decision was arbitrary and capricious.' " *Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 194 (2d Cir.2000) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995)).

The Plaintiff argues that the *de novo* standard of review should apply here. According to the Plaintiff, the Plan conferred upon the administrator sole discretion in determining only the acceptability of all submitted proof of disability. The Plaintiff maintains that this does not provide the administrator with any discretion to resolve disputes or ambiguities relating to the interpretation of the Plan.

■ The Court disagrees with the Plaintiff's contention here. The Plaintiff is correct in that the Plan itself provides the administrator with discretion in determining the acceptability of all submitted proof of disability. If this were the only relevant document here, the Court might agree with the Plaintiff and apply a *de novo* standard of review. This, however, is not the only relevant document. As the Defendant points out, there is also the Employee Benefits Handbook ("the Handbook"). (*See* dkt. # 20, Ex. 35.) The Handbook, a "summary plan description" required under ERISA, *see* 29 U.S.C. § 1022, summarizes various aspects of the Plan and contains the following language:

> The plan administrator has full discretion and authority to make the final decision regarding all areas of plan interpretation and administration, including eligibility for benefits, level of benefits provided, interpretation of plan language (including this summary plan description) or administrative procedures.

> The decision of the plan administrator is final and binding on all individuals dealing with or claiming benefits under the plan, and, if challenged in court, the plan intends for the plan administrator's decision to be upheld, unless found by a court of competent jurisdiction to be arbitrary and capricious.

(*Id.*, p. 108.) Given this express language, it is clear to the Court that the administra-

tor[4] did have discretionary authority to construe the terms of the plan, and the arbitrary and capricious standard of review applies here.

## C. TERMINATION OF BENEFITS

The Court must next determine whether the Plaintiff has raised genuine issues of material fact that would preclude summary judgment. That is to say, the Plaintiff must produce evidence sufficient to demonstrate that the Defendant's decision to terminate his benefits was arbitrary and capricious.

■■■■ "Under this highly deferential standard of review, th[e] Court cannot substitute its judgment for that of the Plan Administrator and will not overturn a decision to deny or terminate benefits unless it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fuller v. J.P Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir.2005) (internal quotation marks omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotation marks omitted). "Where both the [administrator] of a . . . fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control." *Demirovic v. Building Service 32 B–J Pension Fund*, 467 F.3d 208, 212 (2d Cir.2006) (internal quotation marks omitted).

### 1. The Review of the Plaintiff's Medical File

■■■■ The Plaintiff argues that the decision to terminate his benefits was arbitrary and capricious because the Defendant relied on some parts of the medical file while disregarding other parts. The Court does not believe the record reflects this, at least to the extent that the Defendant "disregarded" parts of the Plaintiff's medical file. "Disregard" means to pay no attention to, to leave out of consideration, or to ignore. From what the Court can discern in the record, the Defendant did consider the entirety of the Plaintiff's medical file. That file, however, contained varying opinions as to the Plaintiff's ability to work. In the Court's view, it is not arbitrary and capricious to accept one interpretation over another in a situation (such as here) where there are conflicting opinions as to a claimant's disability status.

Moreover, it is important to establish both what medical information the Defendant had and when the Defendant had it. There are two letters, dated April 5, 1993 and September 11, 1998, from Dr. Krompinger, who once was the Plaintiff's orthopedic surgeon. In the 1993 letter, Dr. Krompinger indicated that although the Plaintiff was disabled from doing his prior job as a drug salesman, he had the "capacity" for light duty or sedentary work, with a five-to ten-pound lifting restriction and a prohibition against repetitive bending. In the 1998 letter, Dr. Krompinger indicated that the Plaintiff (who apparently had a lumbar fusion surgery), should not engage in repetitive bending or repetitive lifting of items over twenty pounds, but otherwise was "certainly" able to work in a sedentary position.

4. Here, the Plan's administrator (Kemper), which evaluated benefit claims, was different from the entity (Abbott) that paid the Plan benefits. Thus, there does not appear to have been a conflict of interest that the Court must weigh as a factor in determining whether there was an abuse of discretion. *See Metropolitan Life Insurance Co. v. Glenn*, —— U.S. ——, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008)

The relevant events that followed next involved the vocational rehabilitation and vocational plans. Sometime in March 2001, the Plaintiff notified Kemper that he would like to be considered for vocational rehabilitation. He formalized this request via a letter dated March 22, 2001. The Plaintiff then filled out a questionnaire, dated October 7, 2001, wherein he informed Kemper that he cooked, mowed the lawn, vacuumed, climbed stairs, and cared for his ten-year-old child on a regular basis. The Plaintiff also represented that he went on daily two-mile walks and drove an average of twenty miles daily. For hobbies, the Plaintiff listed reading, working on his laptop computer, dabbling in web site design, and being an amateur radio operator (or "ham"). In addition, the Plaintiff expressed an interest in seeking training in another line of work, namely, as real estate agent.

Apparently around the same time (i.e., October 2001), the nurse sent by Kemper visited the Plaintiff for the purpose of evaluating vocational rehabilitation request. During this meeting, the Plaintiff represented that he (1) regularly performed the tasks of cooking, child care, mowing the lawn, vacuuming, and climbing stairs; (2) walked two miles daily; (3) was able to drive for twenty miles at a time before needing to stop to stretch and rest; (4) knew how to, and did, use a laptop computer, and knew how to design on the Internet; (5) was a licensed amateur radio operator; (6) volunteered for the Cub Scouts; (7) served as a recess monitor, whereby he stood and watched children at school for thirty minutes at a time; and (8) owned a few rental properties. After meeting with the Plaintiff, the nurse completed a Field Care Management Assessment form, wherein she concurred with Dr. Krompinger's assessment that the Plaintiff could perform sedentary work.

Based on the above, Kemper issued the TSA on October 19, 2001. The TSA's analysis identified five alternate occupations that the Plaintiff would be able to perform: pharmaceutical detailer; sales representative (dental and medical equipment or supplies); sales representative (hotel and restaurant equipment or supplies); sales agent (insurance); and claims examiner. In addition, a Labor Market Survey from Kemper, dated October 22, 2001, stated that potential employment opportunities in these five alternate occupations existed near the Plaintiff's home. The evidence in the record indicates that the specific positions Kemper recommended for the Plaintiff were sedentary/light duty positions.

Nevertheless, the Plaintiff did not accept the recommendations of the TSA or the Labor Market Survey. The Plaintiff disputed the TSA's analysis because the TSA was based on medical documentation that was more than three years old at the time of its completion.[5] The TSA, however, was

5. The Plaintiff argues that some of the occupations listed in the TSA (the sales representative positions) were inappropriate because Dr. Krompinger had indicated in his 1993 letter that the Plaintiff was disabled from doing his prior job as a drug salesman. This argument lacks merit. To begin with, the Plaintiff on the one hand complains that Kemper based the TSA on old medical documentation, yet on the other hand uses Dr. Krompinger's 1993 letter, which is the oldest medical document in the Court's record, to support his assertion that the TSA should not have listed sales representative positions. The TSA was based on medical information that was more current than the 1993 letter; in fact, the medical information upon which the TSA was based was an updated letter from Dr. Krompinger. Moreover, in the 1993 letter, Dr. Krompinger did not state that the Plaintiff was disabled from his position as a drug salesman for all time, and he did not state that no recovery was possible for the Plaintiff. Thus, no reasonable finder of fact could conclude that this letter, issued in 1993 and su-

based on the medical documentation Kemper had at the time. The Plaintiff had not provided Kemper with any updated medical records stating that his condition had changed. Therefore, it was proper for Kemper to base the TSA on the medical information it had.

Furthermore, Kemper had the Plaintiff's October 7, 2001 questionnaire and Field Care Management Assessment form completed by the nurse in October 2001, both of which indicated that the Plaintiff was able to perform certain physical tasks. Although these were not records from the Plaintiff's doctors, they nevertheless were documents Kemper could find informative in creating the TSA, especially considering that one of them, the questionnaire, was completed by the Plaintiff himself. Thus, no reasonable finder of fact could conclude the issuance of the TSA, or its contents, were arbitrary and capricious.

On April 16, 2002, in response the Plaintiff's expressions of interest in the real estate field, Kemper sent to the Plaintiff a letter containing a vocational plan that had been developed specifically for him to assist him in returning to the workforce as a real estate agent. In the vocational plan, Kemper agreed to continue paying benefits under the Plan to the Plaintiff while he attended the New Haven Real Estate School for three-hour classes twice a week for a six-and-a-half week period. Kemper also agreed to continuing paying benefits under the plan while the Plaintiff completed the examination necessary to obtain his real estate license. Kemper advised the

Plaintiff that, upon his successful completion of the real estate course and the licensing examination, his Plan benefits would be terminated in accordance with the Plan's terms.

The Plaintiff did not agree to this plan, and maintains that his medical condition at the time prevented him from being able to participate in this vocational plan. He failed, however, to provide Kemper with any medical documentation showing that his condition had changed. As it did with the TSA, Kemper had only the medical assessments from Dr. Krompinger. Therefore, no reasonable finder of fact could conclude the April 2002 vocational plan was arbitrary and capricious.

Thereafter, Dr. James K. Sabshin ("Dr. Sabshin"), a neurosurgeon, issued an updated medical report, dated May 16, 2002, for the Plaintiff. (*See* dkt. # 20, Ex. 21.) In the report, Dr. Sabshin indicated that he had examined the Plaintiff on May 15, 2002; briefly described the Plaintiff's relevant history, including a March 14, 2000 automobile accident in which the Plaintiff was involved; diagnosed the Plaintiff with potential "lumbosacral sprain or strain type syndrome and probable nerve root injury"; stated that the Plaintiff "has reached maximum medical improvement and has a ten percent (10%) disability of the low back attributable to his motor vehicle accident"; and expressed that he "d[id] not think [the Plaintiff] is totally disabled." (*Id.*) Dr. Sabshin also recommended that the Plaintiff undergo a work capacity test, stated that he would limit

perceded by subsequent medical information, precluded Kemper from listing sales representative positions in the TSA. Additionally, because there is little evidence describing in detail the Plaintiff's job duties in 1990, the Court sees no basis for the Plaintiff's claim that the positions listed in the TSA were "identical" to his former position, especially considering that some of the positions in the TSA were not in the pharmaceutical industry.

Furthermore, no matter the industry, the Court will not assume that the duties of a sales representative in 1990 were necessarily identical to the duties of a sales representative in 2001. In any event, the Plaintiff's assertion (i.e., that each of the positions listed in the TSA were identical to his former position) is clearly untrue, as at least one (claims examiner) does not appear to be in the area of sales at all.

the Plaintiff's "leisure activities," and indicated that the Plaintiff "should not be doing any heavy lifting[ ] [or] quick jerky motions[.]" (*Id.*)

Kemper then issued two subsequent vocational plans in or about June 2002. These vocational plans were similar to the vocational plan from April 2002. In the Court's view, Dr. Sabshin's report did not provide the Kemper with any evidence that the Plaintiff would be unable to perform either the positions listed in the TSA or the training specified in the vocational reports. Dr. Sabshin expressly noted that, in terms of work capacity, he did not think the Plaintiff was totally disabled, and thought that the Plaintiff should be restricted from heavy lifting and jerky motions; thus, Dr. Sabshin's report seems to be in accord with Dr. Krompinger's report from 1998. Consequently, no reasonable finder of fact could conclude that the vocational reports or the TSA were arbitrary and capricious.

Thereafter, counsel for the Plaintiff and agents for Kemper engaged in a series of correspondence beginning in June 2002. Counsel for the Plaintiff repeatedly stated his contention that the positions listed in the TSA were inappropriate and that the vocational plans to allow the Plaintiff to obtain a real estate license were unacceptable. Kemper, for its part, responded by asking counsel for the Plaintiff whether the Plaintiff was willing to comply with the vocational plans, and by consistently requesting medical documentation demonstrating that the Plaintiff was unable to function at the levels required for the TSA positions or the real estate training.

After a number of letters had been exchanged, Kemper sent to counsel for the Plaintiff a letter, dated March 7, 2003,

wherein it indicated that it either needed to know if the Plaintiff would participate in the vocational plan, or required medical documentation showing that the Plaintiff was unable to perform sedentary work. (*See id.*, Ex. 20, pt. J.) Kemper also reminded counsel for the Plaintiff that the Plaintiff's benefits could be terminated if he failed to participate in any rehabilitation or light duty program when able to do so and requested to do so, and asked for a reply by April 7, 2003 to prevent a termination of benefits. (*See id.*)

Counsel for the Plaintiff responded via a letter dated March 11, 2003, wherein he indicated that the Plaintiff had sought treatment from Dr. Spero and undergone an MRI scan of his spine, which was conducted by Dr. Alisa Siegfeld ("Dr. Siegfeld"). In fact, at the time counsel for the Plaintiff wrote his March 11, 2003 letter, Dr. Spero had issued three medical reports (dated October 17, 2002; November 7, 2002; and December 19, 2002) for the Plaintiff, and Dr. Siegfeld had issued one (dated December 17, 2002). Based on the representations in the April 11, 2003 letter, however, it is clear that Kemper had not yet seen these reports. Therefore, it was not arbitrary and capricious for Kemper to issue its demands in the March 7, 2003 letter.

Moreover, upon review of the 2002 reports from Dr. Spero and Dr. Siegfeld, the Court sees no indication that those doctors found the Plaintiff to be totally disabled. The October 17, 2002 report from Dr. Spero recounts Dr. Spero's examination of the Plaintiff and contains Dr. Spero's feelings as to the causes of the Plaintiff's symptoms. (*See id.*, Ex. 26.) This report does not support the conclusion that the Plaintiff was totally disabled.[6] The November

---

**6.** In this report, Dr. Spero does state that the Plaintiff "is actually disabled at this point in time." (Dkt. # 20, Ex. 26.) This statement is not sufficient to support a finding of total

disability. Even the Defendant does not question that the Plaintiff suffered, and suffers, from a disability. Indeed, the Defendant provided the Plaintiff with different vocational

7, 2002 report from Dr. Spero also does not state that the Plaintiff was totally disabled. (*See id.*, Ex. 27.) In fact, the November 7, 2002 report indicates that the Plaintiff was feeling much better after receiving a certain treatment. (*See id.*)

The December 17, 2002 report from Dr. Siegfeld does not state that the Plaintiff was totally disabled. (*See id.*, Ex. 22.) Dr. Siegfeld reported the findings of the Plaintiff's MRI as follows:

The vertebral bodies are normally aligned. No abnormal bone marrow signal is seen. The conus medullaris is normal in appearance and location. Disc degeneration is seen at all lumbar levels, with disc space narrowing and desiccation. The patient has had a discectomy and fusion at L4–5.[7] There is near complete loss of the disc space at this level, and there is marginal spurring. No recurrent disc herniation is seen.

At L2–3, there is a small central disc protrusion with no nerve root impingement or central spine stenosis. At L3–4, there is a small central and left paramidline disc protrusion minimally impressing upon the ventral the cal sac with no nerve root impingement or central spinal stenosis. There is mild bilateral facet arthropathy at this level. At

L5–S1, there is mild disc bulge. The paraspinal soft tissues are normal.

IMPRESSION:

Postoperative changes are seen at L4–5. There is no recurrent disc herniation. Small central disc protrusions are seen centrally at L2–3 and central and off to the left at L3–4 with no nerve root impingement or central spinal stenosis.

(*Id.*) Dr. Siegfeld does not provide an opinion as to whether the Plaintiff was totally disabled.

In addition, the December 19, 2002 report from Dr. Spero does not state that the Plaintiff was totally disabled. Dr. Spero reported that he had reviewed the Plaintiff's MRI, which showed "degenerative discs at every level from L1 to S1; L1–2, 2–3, 3–4, 4–5, and 5–1 but most significantly at L2–3 there is a significant amount of bulging with a high intensity zone as well as at L3–4.[8]" (*Id.*, Ex. 28.) Again, there is no opinion here as to whether the Plaintiff was totally disabled or unable to work.

In his deposition, the Plaintiff testified that Kemper, after receiving the reports from Dr. Spero and Dr. Siegfeld, knew (or should have known) that he suffered from a disease called ankylosing spondylitis, which apparently is a type of arthritis of

---

rehabilitation plans in an attempt to accommodate his disability, attempts which the Plaintiff obviously found to be lacking. The relevant questions here, though, are whether the Plaintiff was totally disabled within the meaning of the Plan, and whether, during the relevant time periods, the Plaintiff had provided Kemper or the Defendant with sufficient medical documentation to demonstrate his total disability.

7. The Court takes note that such references relate to the spinal discs located between the vertebrae, which together make up the vertebral column (or spine). For example, "L4–5" refers to the spinal disc located between the fourth and fifth lumbar vertebrae.

8. The Court points out that, when looking at the same MRI, Dr. Spero, the orthopedist, reported there was a "significant amount of bulging with a high intensity zone" at L2–3 and L3–4, whereas Dr. Siegfeld, the radiologist, reported there was "small central disc protrusion with no nerve impingement or central spinal stenosis" at L2–3, and "small central and left paramidline disc protrusion minimally impressing upon the ventral thecal sac with no never root impingement or central spinal stenosis" at L3–4. It appears to the Court that there may be a slight discrepancy between Dr. Spero's reading of the MRI and Dr. Siegfeld's reading of the MRI because Dr. Spero called the bulging "significant," while Dr. Siegfeld called it "small."

the spine. The Plaintiff testified to his belief that, as seen in the 2002 reports, Dr. Spero and Dr. Siegfeld diagnosed him with ankylosing spondylitis. The term "ankylosing spondylitis," however, does not appear in any of the reports from Dr. Spero or Dr. Siegfeld.

According to the Plaintiff, though, the terminology used in those reports constituted a type of "code" that Kemper should have recognized as meaning "ankylosing spondylitis." The Court rejects such a contention. To begin with, the Court sees no reason why doctors would intentionally speak in code like this. Certainly, doctors often use jargon that is not always understood by laymen, and the reports from Dr. Spero and Dr. Siegfeld are not free from such jargon. Nonetheless, if they had concluded that the Plaintiff suffered from ankylosing spondylitis, the Court can discern no reason why they would not say so. The term "ankylosing spondylitis" is itself a form of medical speak that most likely is not understood by the general public; it makes no sense that the doctors would further hide their diagnosis in a code. Additionally, the Plaintiff presents no evidence that his symptoms, or that the language in Dr. Spero's and Dr. Siegfeld's reports, would implicate only ankylosing spondylitis and no other disease. Thus, the Court sees no basis for concluding that Kemper had known the Plaintiff suffered from ankylosing spondylitis.

In addition, even if Kemper had known about the Plaintiff's ankylosing spondylitis (the confirmed diagnosis of which appar-

ently came via a blood test taken in the latter half of 2005), such knowledge, in and of itself, does not support a finding of total disability. There is no evidence in the record that ankylosing spondylitis, as a general matter, always renders people totally disabled or unable to work. Moreover, even if the 2002 reports from Dr. Spero and Dr. Siegfeld had indicated that the Plaintiff suffered from ankylosing spondylitis, they did not provide an opinion as to the disease's effect on the Plaintiff's ability to work. Therefore, the Court finds that no reasonable finder of fact could conclude that Kemper's conduct up to March 7, 2003 was arbitrary and capricious.

Kemper then had a physician specializing in orthopedic surgery review the Plaintiff's file. This included a review of the Plaintiff's MRI.[9] The physician concluded that, even considering the MRI, the Plaintiff was not precluded from performing jobs in a sedentary, light duty capacity. In light of the information contained the medical documentation provided to Kemper, this was not an arbitrary and capricious conclusion.

Based on the physician's findings, Kemper concluded that there was no documentation of an impairment preventing the Plaintiff from performing any job involving sedentary, light duty work. Thus, on July 3, 2003,[10] Kemper sent to the Plaintiff a letter notifying him of its finding. Kemper also informed the Plaintiff that his Plan benefits would terminate effective

---

9. It does not appear that the 2002 reports from Dr. Spero were considered for this review. (*See* dkt. # 20, Ex. 24.) It is possible that the reviewing doctor did not have them; as seen on the second peer review form, the 2002 reports from Dr. Spero were received as a consequence of the Plaintiff's appeal of the termination of his benefits. (*See id.*, Ex. 31.) This is of no consequence, however, because, as the Court has already noted, the 2002

reports from Dr. Spero do not state that the Plaintiff was totally disabled or unable to work.

10. There is no indication that, after providing his MRI and the 2002 reports from Dr. Spero and Dr. Siegfeld, the Plaintiff sent Kemper any additional medical documentation before July 3, 2003.

July 31, 2003 because he had failed to provide due proof that he was totally disabled, and because he refused to participate in the vocational rehabilitation plans presented to him.

The Plaintiff appealed this finding.[11] In support of this appeal, the Plaintiff submitted the office note from Dr. Lendino dated August 23, 2003. Dr. Lendino was the Plaintiff's general practice physician, not a specialist in orthopedics or neurology. Dr. Lendino's note provides diagnoses of "sciatic syndrome," "reactive depression," "hyperlipidemia," and "mitral valve prolapse." (See id., Ex. 29.) The note also states "PATIENT REMAINS TOTALLY DISABLED AT THIS TIME." (Id.)

Kemper then had a second physician specializing in orthopedic surgery review the Plaintiff's file. This physician's report lists Dr. Lendino's note as a part of the file. The second physician determined that the Plaintiff was not precluded from performing jobs in a sedentary, light duty capacity.

In the Court's view, this was not an arbitrary or capricious finding even considering the note from Dr. Lendino. As noted above, Dr. Lendino is not a specialist in orthopedics or neurology. This is not necessarily dispositive, but it does indicate that he does not have specialized knowledge about the medical condition or conditions relevant to the Plaintiff's case. In addition, upon review of the note, there is no specific reference to the Plaintiff's spinal problems, and Dr. Lendino's instruc-

tions do not contain any directives with regard to the Plaintiff's back. Indeed, the note appears to reference a number of the Plaintiff's medical issues except for his spinal disc problems.[12] Given this fact, the Court discerns no basis for the statement, "patient remains totally disabled at this time." There is certainly no indication Dr. Lendino wrote this after assessing the Plaintiff's spinal problems, or that the statement resulted from an examination of the Plaintiff's spine. Indeed, one could read the statement as simply being Dr. Lendino's notation of what the Plaintiff told him during the visit (e.g., the Plaintiff informed Dr. Lendino that he was totally disabled, and Dr. Lendino, as the Plaintiff's doctor, accepted this, or at least wrote it down). It is not necessarily Dr. Lendino's opinion after examining (e.g., via X-ray or an MRI) the Plaintiff's back, specifically his spinal discs. Even if it were, there is nothing in the note to support such a conclusion. As a result, the Court finds that the second physician's determination after reviewing the Plaintiff's medical file, and Kemper's subsequent upholding of the termination of benefits, was not arbitrary and capricious.

The Plaintiff appealed the finding of the second physician. In support of this second appeal, the Plaintiff submitted a report, dated November 10, 2003, Dr. Spero had sent to counsel for the Plaintiff. In this report, Dr. Spero gave a brief review of the Plaintiff's medical history and noted the treatment he had provided to the

11. The letter submitted by counsel for the Plaintiff, which served as the notice of appeal, recounted the language from Dr. Spero's December 19, 2002 report, and summarized the report as stating that the Plaintiff's "entire spine is deteriorating." Although the undersigned is not a medical doctor, it is apparent that this summary is objectively untrue. Dr. Spero's report does not state that the Plaintiff's "entire spine is deteriorating," but rather notes problems with a five spinal discs

located between certain lumbar and sacral vertebrae.

12. In his note, Dr. Lendino does reference "sciatic syndrome," which, the Court notes, may be caused by spinal disc complications. There is no indication, however, that Dr. Lendino specifically examined or analyzed the Plaintiff's spine or spinal discs, nor does Dr. Lendino identify the bases for his "sciatic syndrome" diagnosis.

Plaintiff; in addition, Dr. Spero noted that the Plaintiff declined to accept certain pain management options. Dr. Spero also stated the following: "I do not believe that even the simplest of positions, without any lifting, or bending, can be performed by [the Plaintiff], because of his inability to be in one position for any period of time greater than 5–10 minutes." (*Id.*, Ex. 33.)

Kemper then had a third physician specializing in orthopedic surgery review the Plaintiff's file, including Dr. Spero's November 10, 2003 report. The physician noted Dr. Spero's belief that the Plaintiff could not perform "even the simplest of positions," but found that Dr. Spero had provided "no objective examination to document this sort of statement." (*Id.*, Ex. 37.)

> The physician concluded that
>
> all of the documentation to date indicates that [the Plaintiff] has had spine surgery and has had hardware removed, [and] he continues to have pain in his back .... His physical exam however does not indicate a functional limitation that would preclude him from sustained light duty work activity. Certainly if his pain was significant enough that he would have difficulty working in a sustained fashion, then additional pain modulation and/or treatment would be advisable.

(*Id.*)

In the Court's view, this was not an arbitrary or capricious finding even considering the November 10, 2003 report from Dr. Spero. As the third reviewing physician pointed out, Dr. Spero's conclusion does not seem to have been based on an objective examination of the Plaintiff's functional abilities. That is, this Dr. Spero's report does not appear to be based on

any objective evidence. Moreover, in the Plaintiff's medical file, there were reports from other doctors who expressly found that the Plaintiff was not totally disabled and that he could perform light, sedentary work duties. Thus, it was not arbitrary and capricious for Kemper to not accept Dr. Spero's belief at face value, especially considering that Dr. Spero's conclusion was not supported by objective evidence, differed from reports of other doctors, and even conflicted with the Plaintiff's own representations in the October 7, 2001 questionnaire (i.e., the Plaintiff informed Kemper that he cooked, mowed the lawn, vacuumed, climbed stairs, cared for his ten-year-old child, went on daily two-mile walks, drove an average of twenty miles daily, read, and worked on his laptop computer).[13] Thus, the Court finds that no reasonable finder of fact could conclude that Kemper or the Defendant acted in an arbitrary or capricious manner here.

### 2. Subjective Complaints of Pain

■ The Court is also not persuaded by the Plaintiff's argument that the decision to terminate his benefits was arbitrary and capricious because Kemper or the Defendant ignored or disregarded the Plaintiff's subjective complaints of pain. With regard to subjective complaints of pain, the Second Circuit has held the following:

> It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.... While a district court reviewing an administrator's decision *de novo* is not required to accept such complaints as credible, ... it cannot dismiss complaints of pain as legally insufficient evidence of disability....

---

**13.** The Plaintiff maintains that his condition somehow worsened after he expressed his interest in obtaining a real estate license, yet

does not appear to have submitted any evidence to Kemper demonstrating how or why his condition worsened.

*Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir.2001) (internal quotation marks and citations omitted). In *Connors,* however, the *de novo* standard applied to the review of the plan administrator's decision, not the arbitrary and capricious standard that applies here. "On arbitrary and capricious review, the consideration of such complaints, including credibility determinations, is within the discretion of the administrator." *Lee v. Aetna Life Ins. Co.,* No. 05–CV–2960, 2007 WL 1541009, at *5 (S.D.N.Y. May 24, 2007).

 Here, there is no indication that Kemper or the Defendant utterly refused to consider the Plaintiff's subjective complaints of pain. The Defendant (or its predecessor) granted long term disability benefits to the Plaintiff for approximately twelve years, and based its decision to do so, in part, on the Plaintiff's complaints of pain. What the Kemper and Defendant ultimately did, however, was credit updated, objective medical evidence over the Plaintiff's subjective complaints of pain. "It is not unreasonable for an insurer to credit objective evidence over subjective evidence." *Couture v. UNUM Provident Corp.,* 315 F.Supp.2d 418, 432 (S.D.N.Y. 2004). Therefore, the Court cannot find that the Defendant's decision to terminate the Plaintiff's benefits was arbitrary and capricious because it credited objective evidence from the Plaintiff's doctors over the Plaintiff's subjective complaints of pain.

### 3. Independent Medical Examination

 The Plaintiff further argues that the Defendant's decision to terminate his benefits was arbitrary and capricious because it failed to consider the findings of an independent medical examination conducted on the Plaintiff, at the Defendant's request, in July 1993. This argument fails for more than one reason. To begin with, the Plaintiff supports this argument by citing to his affidavit, dated December 20, 2007, submitted with the opposition to the Defendant's summary judgment motion. The Plaintiff alleges that "[a]t some time in July of 1993, at the request and instruction of the Defendant or it's [sic] agents, I appeared at the office of Alan E. Bernstein, MD, for an independent medical examination." (Dkt. # 25–4, Plitnick Aff. ¶ 4.) This portion of the affidavit, however, directly conflicts with both the Plaintiff's own deposition testimony (*see* dkt. # 20, Ex. 1, Plitnick Depo. at 121) and interrogatory answers (*see id.,* Ex. 40, p. 6), wherein the Plaintiff stated that the Defendant never sent him for any medical evaluation to confirm his physician's findings. The Second Circuit "follow[s] the rule that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Raskin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997) (quoting *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir. 1996)). As such, the Court finds that it would be improper to consider the Plaintiff's affidavit in this regard, which in turn means there is a lack of evidence demonstrating that the Defendant failed to consider the findings of an independent medical examination conducted in July 1993. *See Carone v. Mascolo,* 573 F.Supp.2d 575, 582 (D.Conn.2008).

Furthermore, even if there had been such an independent medical examination, the fact that it allegedly took place in July 1993 means that the findings of that examination, and any failure by the Defendant to consider those findings, have little relevance here. The Plaintiff's medical file contained a number of medical reports that were more recent than July 1993;

hence, those reports would be more relevant in determining the Plaintiff's disability status during the time period applicable in this case. It would not be arbitrary and capricious to use updated medical reports instead of an older report (which, by July 2003, was ten years old) in determining the Plaintiff's then-current disability status. Consequently, in light of the above, the Defendant's motion for summary judgment (**dkt. # 20**) is **GRANTED.**[14]

## III. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (**dkt. # 20**) is **GRANTED. Judgment in favor of the Defendant, Steven Fussell, Plan**

Administrator for Abbott Laboratories Extended Disability Plan, shall enter on Count One of the amended complaint. Because Count One was the only count in the amended complaint, the clerk shall close this file.

14. The Plaintiff presents three other arguments that are unavailing. The Plaintiff argues that the Defendant acted arbitrarily and capriciously because, instead of considering the SSA's findings regarding the Plaintiff's disability, it focused on the SSA's termination of the Plaintiff's benefits. In the Court's view, it was not arbitrary and capricious for the Defendant to consider the SSA's reasons for terminating the Plaintiff's benefits. Moreover, although the Defendant argued on summary judgment that the SSA's termination of benefits has some relevance here, the record contains little evidence that the SSA's findings played a significant role in Kemper's or the Defendant's decision-making process. As seen from the Court's analysis above, one does not need the SSA findings to determine that the Defendant did not act arbitrarily or capriciously.

The Plaintiff also argues that the Defendant acted arbitrarily and capriciously because the TSA contained five occupations that were "identical" to the Plaintiff's former position, and because two of the five occupations did not have a high enough salary under the Plan. As seen in Footnote 5 above, the Court has addressed the first half of this argument and found it to be without merit. As for the second half of this argument, the Plaintiff alleges that, in determining the positions for which he was qualified, the Defendant incorrectly stated that his salary had been $38,765, when in fact it had been $42,000. Because under the Plan the Plaintiff was entitled to

positions paying, at a minimum, 70% of his former salary, the Defendant's use of the lower number caused it to put positions on the TSA that did not have high enough salaries. Even assuming that $38,765 was the incorrect salary, the use of this number does not mean that the issuance of TSA was arbitrary and capricious; it simply indicates that the Defendant may have been mistaken as to the amount of the Plaintiff's former salary. There is no evidence that this was anything more than a mistake, and the Court points out that there is no evidence that the Plaintiff, at the time he received the TSA, alerted the Defendant about this mistake.

Finally, the Plaintiff argues that it was arbitrary and capricious for the Defendant, in issuing its vocational plans, to require the Plaintiff to agree to a set termination date of his benefits. Under the Plan, however, the Defendant could terminate the Plaintiff's benefits the date on which the employee refused or failed to participate in any rehabilitation program or light duty program when able and requested to do so by his employer. In the Court's view, the Defendant's actions were consistent with the Plan; as the Defendant points out, the Plan contains no provision requiring the Plan administrator, after a recipient has completed a vocational plan, to wait to terminate benefits until the recipient is employed.